[No. B069051. Second Dist., Div. Three. Oct. 6, 1995.]

CITY OF SOUTH EL MONTE, Plaintiff and Respondent, v.
SOUTHERN CALIFORNIA JOINT POWERS INSURANCE
AUTHORITY, Defendant and Appellant.

1630

## COUNSEL

Morgan, Wenzel & McNicholas, John A. Kaniewski, Baker, Silberberg & Keener and Robert A. Cardwell for Defendant and Appellant.

Weissburg & Aronson, Gregory V. Moser, Bret J. Davis, Greines, Martin, Stein & Richland, Kent L. Richland, Shelley Levine, Kronick, Moskovitz, Tiedemann & Girard, Edward J. Tiedemann, Robin Leslie Stewart, Farmer & Murphy, Craig E. Farmer, Stephen D. Underwood, Robert J. Feldhake, Jackson, Emerich, Pedreira & Nahigian, Donald A. Jackson, David G. Hansen, Liggett & Kemp-Williams and Margaret E. Kemp-Williams as Amici Curiae on behalf of Defendant and Appellant.

Richards, Watson & Gershon, Anthony B. Drewry, Quinn M. Barrow and John A. Belcher for Plaintiff and Respondent.

Freilich, Kaufman, Fox & Sohagi, Deborah J. Fox, Dawn R. Andrews, Richards, Watson & Gershon, Quinn M. Barrow, Adams, Duque & Hazeltine, Richard R. Terzian, Sara A. Culp, Nelsen, Thompson, Pegue & Thornton, Romain Oliver Nelsen, Glenn M. White, Parker, Covert & Chidester and Jonathan J. Mott as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KITCHING, J.**—This appeal involves issues of coverage for members of a joint powers insurance authority. The matter arises from a declaratory relief and breach of contract action seeking a determination of a joint powers authority's duty to defend and indemnify a member city against a lawsuit for damages caused by the enactment of an anti-noise ordinance.

Defendant and appellant Southern California Joint Powers Insurance Authority (Authority) appeals from the summary judgment entered in favor of plaintiff and respondent City of South El Monte (City) on City's action for declaratory relief and breach of contract.

The question this court must decide is whether the Authority, a self-insuring pool comprised of 35 member cities, must defend and indemnify City for damages that allegedly resulted from the passage of a municipal ordinance. Under the facts of this case, our answer is no.

We find the member cities of the Authority determined the risks of loss they agreed to cover from their pooled funds. The joint powers agreement and the intent of the cities which signed it governed the operation and interpretation of their joint liability protection program. The scope of coverage is defined in the memoranda and the excess insurance policies that comprise this self-insurance program. The member cities, through the Authority, adopted the definition of occurrence contained in the excess insurance policies to determine what claims they would cover.

We find coverage of City in the underlying lawsuit was precluded under the joint liability program administered by the Authority because the adoption and enforcement of a municipal ordinance did not constitute an occurrence for which claims were pooled. Therefore, the Authority had no duty to defend or indemnify City. Accordingly, we reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Municipal Joint Liability Pools*

Joint powers authorities, in which two or more municipalities join together to exercise any power that each has the power to exercise individually, have been sanctioned by the Joint Exercise of Powers Act, Government Code section 6500 et seq., since 1949.[1] The municipalities have the power to insure, either through self-insurance or the purchase of a commercial policy, or both, against a broad range of liabilities. (§§ 990, 990.4.) They can also insure through participation in joint powers pooling arrangements, such as the Authority. (§ 990.8, subd. (a).) To understand the rights and obligations of the signatory members of the Authority, we first look at the purpose and development of these joint powers pooling arrangements.

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

Also, article XVI, section 6 of the California Constitution provides, in relevant part, "that this section shall not prohibit any county, city and county, city, township, or other political corporation or subdivision of the State from joining with other such agencies in providing for the payment of workers' compensation, unemployment compensation, tort liability, or public liability losses incurred by such agencies, by entry into an insurance pooling arrangement under a joint exercise of powers agreement, or by membership in such publicly-owned nonprofit corporation or other public agency as may be authorized by the Legislature; . . . ."

### a. *Background*

In the 1970's, California cities faced an insurance crisis. Many commercial carriers refused to provide liability insurance to governmental agencies. When insurance was available, the increased costs of coverage made it unaffordable. (Young, *Survey Results: Pools a Significant Risk-Financing Option* (May/June 1988) Public Risk.)

In response to the crisis, the cities of Contra Costa County, in December 1975, undertook a study which showed the feasibility of a collective insuring arrangement, such as a self-insured liability pool, as an alternative to commercial insurance.[2] The concept of pooling, the sharing of risks by multiple entities through the use of joint self-insurance and excess insurance programs, was attractive to small and medium-size cities that did not have the financial capabilities to provide their own self-insurance programs. The study indicated the pools would provide a cost savings and create an internal administrative structure that would be responsive to claims and effectively manage the members' risk liability program. (Warren et al., Joint Risk Management and Insurance Study.)

The respective city attorneys who reviewed the study concluded, based upon discussions with legal counsel at the Department of Insurance, that although these municipal insurance pools would be constitutional, the department would regard such arrangements as "a clear situation of transacting insurance."[3] However, subjecting the pools to the statutory requirements of

---

[2] Additionally, a study undertaken by the California Contract Cities Association, on behalf of its member cities, determined that pooling of self-insured losses and the purchase of excess insurance was economically feasible. This study recommended the cities join under the terms and provisions of the Joint Exercise of Powers Act (§ 6500 et seq.) to provide an agency to administer the cities' liability risk program, to pool their losses, and to consider the purchase of excess insurance from corporate insurers. As a result of that study, 35 Southern California cities entered into an agreement to create the Authority, the defendant and appellant in this case.

[3] In an April 7, 1976, letter to city managers of Contra Costa County, David J. Levy, chairman, ad hoc Insurance Committee of City Attorneys of Contra Costa County, stated, in relevant part: "The legal counsel in the Department of Insurance have been most cooperative. Under present law, they are convinced that [in] a pooling arrangement where cities accept premiums, pool the funds and use them to share risk, there is a clear situation of transacting insurance. Such action would require full compliance with the existing insurance statutes as to organization, funding reserves, etc. Without in any way committing the Department of Insurance, it was indicated that the Department would neither oppose nor support enabling legislation that would provide for a pooling arrangement provided that it was restricted to cities (possibly governmental entities). They feel that present law permits two or more cities with separate insurance programs to act under one risk administrator. The Department of

the Insurance Code would place member entities in the position of having the same duties and obligations as commercial insurers. Such an arrangement would adversely affect the pool's ability to provide members cost-effective liability coverage and subsequently defeat the purpose and intent of these self-insuring groups. The attorneys recommended a legislative solution.[4]

### b. *Government Code Section 990.8, Subdivision (c)*

The legislative response to the municipal insurance crisis and implementation of the pooling arrangement was Senate Bill No. 2054. The purpose of this bill was to amend section 990.8 and recognize these self-insuring pools as an alternative to insurance and remove them from regulation under the Insurance Code. (See Assem. Com. on Finance, Insurance, and Commerce, Analysis of Sen. Bill No. 2054 (1975-1976 Reg. Sess.) as amended June 1, 1976.) The legislative analysis stated, in relevant part:

"Senate Bill 2054 amends that portion of the Government Code which authorizes a local governmental agency to insure itself for the following risk:

"Tort or inverse condemnation liability;

"errors and omissions liability of employees; and

"insurance against the expense of defending a claim against the local public entity or employee. (Government Code § 990)

---

Insurance is willing to review any proposed enabling legislation and suggested that we consider pooling arrangements that would be restricted to cities within a geographical area such as a county. . . . [¶] . . . [¶] From the foregoing, it is the conclusion of this report that under existing state law, a pooling arrangement where cities pay amounts into a pool [that would be] used to pay claims of the participating cities, there is an insurance business subject to the Insurance Code pertaining to insurance in general. . . ."

[4]In a May 13, 1976, memorandum to Dave Levy, city attorney for the City of Concord and Dave Beauty, attorney for the League of California Cities, James Alkire, city manager of the City of Pleasant Hill stated, in relevant part: "Our Self Insurance Committee met and Dave Warren agreed to draft some language for legislation which would clear up conflicts between the Government Code and the Insurance Code. [¶] Mr. Warren believes that there should be an Addendum to Paragraph 1 Section 990.8 of the Government Code as follows: [¶] *Existing* [¶] *990.8 Insurance by two or more local public entities.* Two or more local public entities, by a joint powers agreement made pursuant to Article I (commencing with Section 6500) of Chapter 5 of Division 7 of Title 1 of the Government Code, may provide insurance authorized by this part by any one or more of the methods specified in Section 990.4. [¶] *Addendum* [¶] The pooling of self-insured claims or losses among entities as authorized in 990.4(a) shall not be considered insurance nor be subject to regulation under the Insurance Code."

"Section 990.4 permits a local government entity to self-insure, buy insurance through an admitted carrier, or purchase insurance through a surplus line broker, or any combination of the above. Section 990.8 authorizes two or more local entities, by a joint powers agreement, to provide the insurance authorized by that part of the Government Code cited above through any method authorized in Section 990.4. The management consultant study [Contra Costa County cities] concluded that under existing law, it is permissible for local public entities to pool their liability risks but that a question remains as to whether or not they could lawfully pool property and workers compensation risks since it may be considered 'insurance' thereby subjecting the entities to a need to obtain certificates of authority. As a result, SB 2054 proposes to provide that the pooling of self-insured claims or losses as authorized by Section 990.4 shall not be considered insurance nor be subject to regulation under the Insurance Code." (*Ibid.*) On October 1, 1976, Senate Bill No. 2054 became law and section 990.8 was amended to add a provision stating: "The pooling of self-insured claims or losses among entities as authorized in subdivision (a) of Section 990.4 shall not be considered insurance nor be subject to regulation under the Insurance Code." When Section 990.8 was again amended in 1982, the new provision became subdivision (c).[5] Subdivision (c) has two parts. First, it exempts self-insurance programs from Insurance Code regulation. Second, it declares that self-insurance programs "shall not be considered insurance."

Against this background, the Authority was formed.

2. *The Authority and the Joint Liability Insurance Program*

In June 1977, 35 Southern California cities, including South El Monte, entered into a written joint powers agreement (Agreement) creating the

---

[5]Government Code section 990.8 now reads: "(a) Two or more local public entities, by a joint powers agreement made pursuant to Article 1 (commencing with Section 6500) of Chapter 5 of Division 7, may provide insurance authorized by this part or for any other purpose by any one or more of the methods specified in Section 990.4. Where two or more hospital districts have joined together to pool their self-insurance claims or losses, any nonprofit corporation created pursuant to subdivision (p) of Section 32121 of the Health and Safety Code, and affiliated with a hospital district which is a party to the pool may participate in the pool. [¶] (b) Two or more local public entities having the same governing board may be coinsured under a master policy and the total premium may be prorated among those entities. [¶] (c) The pooling of self-insured claims or losses among entities as authorized in subdivision (a) of Section 990.4 shall not be considered insurance nor be subject to regulation under the Insurance Code."

Authority. The Agreement delineates the powers and the limitations of the Authority.[6]

Under terms of the Agreement, the Authority is a separate entity with responsibility "to administer a joint protection program wherein Cities will pool their losses and claims, [and] jointly purchase excess insurance and administrative and other services . . . ." (Art. 2.) It is authorized to provide insurance coverage "as necessary," including, but not limited to, self-insurance and commercial insurance, as well as excess coverage. (Arts. 5, 19.) The Authority assists the cities in obtaining insurance coverage for risks not included in the basic coverage of the Authority. (Art. 19.) The Authority also provides claims adjusting and subrogation services for claims covered by the joint liability protection program. (Art. 19.)

The governing power of the Authority resides in a board of directors (Board), composed of one representative from each member city, specifically a city council member. (Art. 7.) The Board elects a 5- to 9-member executive committee from among its members, to which it may give authority to make and implement any decisions, including those involving administration of the Authority. (Arts. 8, 10.) The president of the Board sits on the executive committee. (Art. 10.) The Board has the power to review, and/or modify or override, any decision or action of the executive committee. (Art. 8.) The executive committee has the power to determine and select a joint liability protection program for the Authority, including all necessary insurance and excess insurance needed to carry out the program.

The joint liability protection program (Program) offered by the Authority consisted of a self-insurance retention pool and excess coverage provided by a commercial insurance carrier. The Program encompassed defense and indemnity against public tort liability as well as workers' compensation coverage and the health and welfare benefit programs of the member cities. (Art. 10.) Article 15 of the Agreement specifically required liability insurance coverage for member cities. This would provide them protection against claims for personal injury, errors and omissions, contractual liability,

---

[6]The purpose of the Agreement is stated in article 2 which reads, in relevant part: "This agreement is entered into by Cities pursuant to the provisions of California Government Code Sections 990, 990.4, 990.8. and 6500 et seq. in order to provide more comprehensive and economical liability coverage, to reduce the amount and frequency of Cities' losses, and to decrease the cost incurred by Cities in the handling and litigation of claims. This purpose shall be accomplished through the exercise of the powers of Cities jointly in the creation of a separate entity, the Southern California Joint Powers Insurance Authority (the Authority), to administer a joint protection program wherein Cities will pool their losses and claims, jointly purchase excess insurance and administrative and other services, . . . ."

comprehensive liability, and "such other areas of coverage as the Executive Committee may determine."

The "Memorandum of Joint Liability Protection Program," adopted by the executive committee, explained the purpose and terms of the Program and stated, in relevant part: "This Memorandum is not and shall not be construed as a contract between the Authority and its **Members**. The only Agreement between the **Members** is the Agreement of the **Members** Creating the Authority as amended from time to time. The provisions of the Joint Protection Program are subject to and subordinate to said Agreement or any action taken by the Board of Directors in connection with the Joint Liability Protection Program."[7]

As to coverage, the memorandum provided that "[t]he Authority will pay on behalf of the **Covered Party** all sums which the **Covered Party** [member or entity signatory to the Agreement] shall become obligated to pay by reason of liability imposed by law for monetary damages because of: [¶] **A. Bodily Injury** [¶] **B. Property Damage** [¶] **C. Errors and Omissions** [¶] **D. Personal Injury** [¶] as these terms are herein defined and to which this Memorandum applies, caused by an **Occurrence** during the period of joint self-insurance. [¶] Coverage shall be determined based upon the facts alleged in the claim or lawsuit or subsequently discovered and ascertained . . . ." The memorandum defined "occurrence" as "an accident, or event including continuous or repeated exposure to conditions, which results during the period of self-insurance, in **Bodily Injury** or **Property Damage** neither expected nor intended from the standpoint of the **Covered Party**."[8] The memorandum further provided that "[a]ny disputes concerning coverage or procedures of the Joint Liability Protection Program shall be appealed to the Authority's Executive Committee in the manner and form that it may from time to time determine."

The Program administered by the Authority consisted of the following features: (1) member cities bore individual responsibility for losses incurred up to the first $10,000; (2) covered losses incurred which exceeded $10,000

[7]The relevant coverage term in this case is the period July 1, 1984, through June 30, 1986. The alleged incident complained of in the underlying action occurred in 1985. The "Memorandum of Joint Liability Protection Program" provided by the parties, and relied upon by this court, went into effect July 1, 1986. James Moore, the Authority's insurance manager, testified in his deposition that the policy and definitions contained in the 1986 memorandum were the same as in the 1985 memorandum.

[8]The memorandum definition of "occurrence" is identical to the one used in the excess insurance policies. The parties agreed coverage was determined by the meaning of "occurrence" as defined in those policies.

but did not exceed $90,000 were paid out of the Authority's self-insurance retention pool; (3) covered losses exceeding $90,000 but not exceeding $400,000 were covered by the same self-insurance pool, with the added feature that such losses were shared by member cities in amounts proportional to the size of their city payrolls and subject to a premium refund; and (4) losses in excess of $400,000 were covered by excess indemnity insurance purchased by the Authority.

City was also issued memoranda entitled "Summary of General Liability Program" for July 1, 1984, through June 30, 1985, and for July 1, 1985, through June 30, 1986.[9] The memoranda explained the Program would provide for pooling the self-insured retained losses of the member cities, and attached copies of the excess liability insurance policies the Authority had obtained for the members. The memoranda further explained that "[i]n accordance with the Agreement, the Authority will administer, investigate, defend, settle and/or pay on behalf of Members, all claims and judgments which are under the retention level and within the *defined coverage* of the Excess Insurance." (Italics added.) The memoranda summarized procedures for filing and reviewing claims, and specifically stated "[t]he Authority shall have no right, duty or obligation to defend claims *which are not within the coverages provided and defined* in the Excess Insurance Policies." (Italics added.)

Member cities received still additional information regarding the Program. An October 23, 1985, memorandum entitled, "Procedures on General Liability Coverage Determination," adopted as a policy statement by the executive committee, provided further explanation of procedures and coverage determinations.[10] The memorandum explained coverage determinations were made pursuant to the definitions, terms, conditions and exclusions in the excess insurance policies. Furthermore, "[a]ny claims or suits, or parts thereof, which are not within the coverage of the excess insurance are not 'self-insured'. They are 'uninsured', and [the Authority], under the Agreement, has no authority to defend or pool them." Additionally, the memorandum stated: "In cases where coverage is denied or disputed, Primary Insurance Carriers issue a 'Reservation of Rights' letter. [The Authority] does not

---

[9]While City may have received additional memoranda for prior years, the period July 1, 1984, through June 30, 1986, represents the relevant and undisputed coverage term in this case. From July 1, 1984, through June 30, 1985, the stated policy limits for the Program were $35 million per occurrence, and from July 1, 1985, through June 30, 1986, the stated policy limits were $10 million per occurrence, exclusive of the member cities' $400,000 self-insured retention.

[10]According to claims procedure, member cities submitted claims to Carl Warren & Company (Warren), an independent company procured by the Authority to investigate and handle the member cities' liability claims. Warren did not make coverage determinations. Those decisions were made by the Authority's insurance program manager.

issue 'Reservation of Rights' letters, per se, because it is *not* an insurance carrier, and does not wish to give any appearance of being such. Also [the Authority] is not bound by the 'Duty to Defend' principle which is applicable only to primary insurance carriers."

City was also issued copies of "Summary of Comprehensive General (and Automobile) Liability Coverage Program," Nos. 10 and 14, for the relevant coverage period, which summarized details of the schedule of coverage more fully explained in the "Summary of General Liability Program" memoranda and the policies.

### a. Contract Law Determines Questions of Coverage

Both parties agree coverage of claims under the Program will be determined by the terms and definitions of the excess insurance policies. However, the issue arises whether principles of insurance law should be used to resolve questions of coverage. Under the facts of this case, our answer is no. Considering the purpose of the pooling arrangements, we determine questions of coverage are properly answered by relying on rules of contract law that emphasize the intent of the parties. Given a local entity's broad power to insure against all potential liabilities and to do that through joint power pooling arrangements, principles governing insurance carriers and insurance law have no applicability, absent consent of the parties to the pooling agreement.

Joint authority pools are member directed. Municipalities best understand the nature of their risks and losses and a "sense of ownership in the pool endeavor [is] an important motivation in practicing risk management." (Young, *Survey Results: Pools a Significant Risk-Financing Option, supra,* p. 28.) The pools are the creation of the membership and reflect the local perspective on matters the members have elected to pool and share. Members agree to abide by the terms of their joint powers agreements and programs and agree to pool prescribed losses. They have the authority to self-insure as they deem appropriate and to provide additional coverage as necessary. This authority is based on the members' perceptions of which risks they elect to pool and which risks they do not.

Members jointly determine the scope and extent of their own coverage. They do so by creating member-written agreements and programs tailored to suit the needs of the participating entities. The governing bodies of these pooling arrangements interpret the agreements and programs to implement the intent of the members. The joint powers agreement, bylaws and the self-insurance program, with related coverage memoranda, provide the

framework within which to determine the rights, liabilities, and intentions of the pools and their respective members.

In our case, an analysis of duty to defend and coverage issues must give full effect to the intent of the member cities of the Authority as reflected in the policies and procedures adopted by the executive committee with the approval of the Board. The Authority, through its members, agreed to adopt the definition of occurrence in the excess insurance policies to decide the issue of what is a covered claim. They did not agree to also incorporate principles governing insurance carriers and insurance law into coverage decisions. It is this Agreement by the member cities that is the crux of the coverage determination.

b. *The Excess Insurance Policies*

Between 1984 and 1986, the Authority purchased a "Special Excess Liability Policy for Public Entities" for the member cities.[11] The policies named the Authority and each member city as named insureds, and provided coverage for damages due to bodily injury, property damage, errors and omissions, and personal injury "to which this policy applies, caused by an occurrence." [12]

The first policy, No. SXP 3584343, defined occurrence as "an accident, or event including continuous or repeated exposure to conditions, which results during the policy term, in *bodily injury* or *property damage neither expected nor intended from the standpoint of the insured.*" (Italics added.) As to errors and omissions, " 'occurrence' means any actual or alleged errors or omissions by an insured during the policy term, which results in injury or damage neither expected nor intended from the standpoint of the insured." An "occurrence" was additionally defined as "any injury or damages sustained during the policy term, by any person or organization and arising out of *personal injury . . . .*" (Italics added.)

In a special endorsement to the first policy for law enforcement activities, "occurrence" was defined as "an event, including continuous or repeated

---

[11]Excess insurance policy No. SXP 3584343 (with an endorsement amendment) covers the period from April 1, 1983, to July 1, 1985, and policy No. SXP 3584427 covers the period from June 30, 1985, to June 30, 1986.

[12]During oral argument, we invited City to file a letter brief citing language in the excess insurance policies demonstrating coverage for claims alleged in the underlying Sherlin action. City advised this court coverage could be found, in part, pursuant to the "occurrence" definitions in the two excess liability policies and the special endorsement for law enforcement activities. (June 17, 1994, letter from City's counsel to the court.)

exposure to conditions, which results in bodily injury, property damage or *personal injury neither expected nor intended from the standpoint of the insured*, as respects occurrences arising from law enforcement activities . . . ." (Italics added.) The endorsement further stated "[w]here there is a conflict between the insuring agreements, definitions . . . of this endorsement and those of the policy, the insuring agreements, definitions . . . of this endorsement shall apply." "It is a well established rule of construction of insurance policies that if the provisions of an effective indorsement conflict with those of the body of the policy, the indorsement controls. [Citations.]" (*Estate of Murphy* (1978) 82 Cal.App.3d 304, 309-310 [147 Cal.Rptr. 258].)

The second policy, No. SXP 3584427, defined occurrence as "an accident, or event, including injurious exposure to conditions, which results, during the policy period, in personal injury, property damage, or public officials errors and omissions *neither expected nor intended from the standpoint of the insured.*" (Italics added.)

We conclude that the insuring language in the relevant policies, read in conjunction with the special endorsement, limits the definition of "occurrence" to damage for bodily injury, property damage, errors and omissions, *and* personal injury which is neither expected nor intended from the standpoint of the insured. This is the same definition contained in the memorandum of joint liability protection program.

### 3. *The Third Party Lawsuit*

On or about April 14, 1986, Jacquelyn Sherlin (Sherlin) filed a first amended complaint for damages against City and Councilman Stanley M. Quintana (Quintana) for violation of federal civil rights (42 U.S.C. §§ 1983, 1985, 1988), interference with prospective economic advantage, and intentional infliction of emotional distress. The complaint alleged that City and Quintana "unlawfully agreed and conspired" to enact and enforce an antinoise ordinance for the purpose and effect of preserving Quintana's residence and closing down Sherlin's business.[13]

According to the Sherlin action, in March 1985, Sherlin relocated her electroplating business to an area of City zoned for industrial and manufacturing use, and adjacent to Quintana's residence. City immediately enacted an emergency anti-noise ordinance that imposed residential noise limits in that industrial area, which adversely affected the business's necessary nighttime operations. City then enforced the ordinance, from March 1985 through

---

[13]We subsequently refer to this pleading as the Sherlin action.

December 1985, by subjecting Sherlin's business to frequent and disruptive inspections by law enforcement officers and health and safety inspectors. Sherlin's business sustained severe economic damage. The Sherlin action further alleged City and Quintana were liable for these losses because the enactment and enforcement of the ordinance caused cessation of the business, reduction of the value of its assets, and destruction of any profits that would have been generated.

City tendered the Sherlin action to the Authority for purposes of a defense and for indemnification.

### 4.  The Rejection of Tender of Defense

The Authority rejected City's tender of defense.[14] Based on the complaint, the Authority denied coverage and declined to defend on grounds the charging allegations did not give rise to a covered "occurrence" as defined by the terms of the policies, and liability for the City's actions was not within the terms of the pooling program adopted by the member cities.

After a period of litigation, City settled the Sherlin action by agreeing to pay $75,000.

On July 26, 1990, City filed a first amended complaint against the Authority for declaratory relief and breach of contract seeking a determination of the Authority's duty to provide a defense against the Sherlin action and to indemnify City for costs of settlement and retained counsel. On September 17, 1990, the Authority answered and denied City's allegations, and asserted a number of affirmative defenses, including lack of any contractual agreement and failure of the Sherlin action to allege any covered occurrences.

### 5.  Summary Judgment Motion

On April 7, 1992, City moved for summary judgment on grounds of the Authority's obligation to defend and indemnify.[15] City argued it was entitled to have the Authority defend the underlying Sherlin action because allegations of damage for errors and omissions and personal injury gave rise to

---

[14]After receiving the claim, the Authority initially requested that Warren assign an attorney to the Sherlin action only to prevent a default from being taken against City. After the Authority declined to provide a defense, City retained a private law firm to litigate the action on its behalf.

[15]The record reflects only City filed a motion for summary judgment and Quintana did not join in the motion. The Authority appealed from the trial court's granting of summary judgment in favor of City, and only City filed a respondent's brief.

covered occurrences under the terms of the Agreement and excess insurance policies. City further argued the terms of the Agreement, Program, and coverage memoranda, created a contract of indemnity between the two entities, under which the Authority was obligated, pursuant to a "benefit of any doubt" standard of review, to reimburse City for defense and settlement costs.[16]

In opposition, the Authority argued it was not a commercial insurer and had never issued an indemnity contract to City. Furthermore, the Authority argued, the Sherlin action alleged intentional enactment and enforcement of a municipal ordinance that had the intended result of shutting down Sherlin's business, acts that did not constitute occurrences for the purpose of triggering coverage under the terms of the Program.

In a declaration filed in support of the Authority's opposition, Authority's insurance program manager James Moore (Moore) provided evidence that the scope of coverage of the Program was determined by the member cities. Moore declared: "While the Authority may apply the . . . Program broadly in order to give the member cities the benefit of the doubt, the Program is certainly not without limits. Throughout their agreement, the *member cities*, not the Authority, determine the types of claims to be covered under the Program. The Authority is certainly not at liberty to extend the Program beyond the scope of claims which the member cities expect to be covered. [¶] Claims which fall within the parameters of the . . . Program administered by the Authority are those which the member cities have agreed amongst themselves to include within the program, nothing more and nothing less. The procedures for implementation of this Program are construed by the Authority's staff broadly so that the member cities will know that they are receiving fair, consistent, and unbiased consideration by the staff of the Authority. If the membership disagrees with this broad interpretation, they are at liberty to have their grievances heard through the democratically constituted executive committee which has the power to change these procedures and overrule staff coverage decisions."

In further support of the opposition, the Authority attached a transcript of Moore's deposition in which the insurance manager testified that when he reviewed the Sherlin complaint he first considered whether there was an "occurrence" as defined in the excess policies. This was the same definition

---

[16]City requested indemnification in the total amount of $281,322.28, which included settlement costs and attorney fees, less the Program deductible ($10,000).

In light of our decision to use rules of contract interpretation to review the Authority's coverage decisions, we reject City's argument the Authority should be held to a broader administrative "benefit of any doubt" standard for coverage review.

the executive committee relied upon in making its decisions. The allegations in the complaint all flowed from the City's passage and/or enforcement of the anti-noise ordinance. Moore further testified the definition of "occurrence" excluded acts considered intentional and deliberate, and the passage of the ordinance as a joint action of a majority of the city counsel was such an act. Moore recommended coverage be denied based on lack of an occurrence and informed City, which appealed the decision to the executive board. The executive board denied City's appeal. In fact, Moore testified on two other occasions the executive board affirmed the denial of coverage in cases based on legislation passed by member cities. Moore stated that "this ordinance matter had been before the executive committee for consideration several times before, and they said we did not intend to include in our agreement to pool losses claims arising out of the passage or enforcement of ordinances." Moore further testified that neither allegations of negligence nor claims of constitutional violations were matters that triggered coverage under the Program.

In its reply, City failed to provide any contravening evidence.

The trial court granted City's motion and found: (1) indemnity of defense fees was governed by a broad "benefit of any doubt" standard, (2) the Agreement and coverage memoranda constituted a contract of indemnity between the Authority and City, (3) the allegations of the Sherlin action constituted covered occurrences, and Authority provided no evidence to the contrary, (4) Insurance Code section 533 was inapplicable, and (5) defense charges were reasonable and related to the defense and settlement of the Sherlin action, and the Authority failed to provide any factual basis to challenge the reasonableness of the fees or underlying settlement. Central to the trial court's decision was its finding the Authority breached its contractual obligation to indemnify City against attorney fees and settlement costs.

On June 10, 1992, the trial court granted City's motion for summary judgment. On June 11, 1992, judgment for $281,322.28, and costs, was entered in favor of City.

On July 8, 1992, the Authority filed a timely notice of appeal.

CONTENTIONS

The Authority primarily contends the trial court erred in granting City's motion for summary judgment and in finding (1) a contract of indemnity existed between City and the Authority, (2) insurance law was applicable to resolve coverage disputes, and (3) allegations in the Sherlin action were not

covered occurrences under the Program and the policies triggering a duty to defend and indemnify.

DISCUSSION

### 1. *Standard of Review*

■ "Summary judgment is properly granted when the evidence in support of the moving party establishes that there is no material issue of fact to be tried. (Code Civ. Proc., § 437c; . . . .) The trial court must decide if a triable issue of fact exists. If none does, and the sole remaining issue is one of law, it is the duty of the trial court to determine the issue of law. (*State Farm Fire & Casualty Co.* v. *Eddy* (1990) 218 Cal.App.3d 958, 964 . . . .) . . . . [¶] Appellate review of summary judgment is limited to the facts contained in the documents presented to the trial court. This court exercises its independent judgment as to the legal effect of the undisputed facts disclosed by the parties' papers. (*State Farm Fire & Casualty Co.* v. *Eddy*, *supra*, 218 Cal.App.3d at p. 965; *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1086-1087. . . .)" (*B & E Convalescent Center* v. *State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 88-89 [9 Cal.Rptr.2d 894].)

### 2. *The Authority Had No Duty to Indemnify or Defend Where the Claims Did Not Constitute Occurrences*

■ The Authority and City dispute whether Sherlin's claims included covered "occurrences" that triggered a duty to defend and indemnify. They also dispute whether City's intentional conduct in enacting and enforcing the emergency anti-noise ordinance formed the basis of a covered claim. We determine City's conduct in enacting and enforcing an anti-noise ordinance did not constitute an occurrence that would trigger insurance coverage.

The Sherlin action fails to allege losses were caused by an "occurrence" as defined by the policies and interpreted by the executive committee. As previously discussed, the insurance policies contained language which restricted coverage to bodily injury, property damage, errors and omissions, and personal injury caused by an "occurrence" which is defined as "an accident, *or event* including continuous or repeated exposure to conditions, which results during the policy term, in bodily injury or property damage *neither expected nor intended from the standpoint of the insured.*" (Italics added.)

In *United Pacific Ins. Co.* v. *McGuire Co.* (1991) 229 Cal.App.3d 1560 [281 Cal.Rptr. 375], an insurer filed a declaratory relief action for judicial

determination of its obligation to defend and indemnify defendants in a wrongful termination action. The court was faced with an endorsement to a standard general liability policy that contained an extended definition of "occurrence." (*Id.* at p. 1565.) Instead of defining the word only in terms of an "accident," the extended definition added the term "event," making it similar to the definition in our case. The *United Pacific* court further determined the phrase " 'neither expected nor intended' " from the standpoint of the insured modified "the word 'damage,' excluding from coverage those elements of damage that are expected or intended by the insured." (*Id.* at p. 1566.) Therefore, defendants would be covered for the intentional act of terminating the employee, as long as the results of the termination—emotional distress, were not also intended or expected by defendants. (*Ibid.*; see also *Dykstra* v. *Foremost Ins. Co.* (1993) 14 Cal.App.4th 361, 367 [17 Cal.Rptr.2d 543].)

City argues *United Pacific Ins. Co.* v. *McGuire Co., supra*, 229 Cal.App.3d 1560 supports coverage for its intentional enactment of municipal legislation. However, City, and the trial court, confuse coverage for intentional acts with coverage for intentionally caused damage. *United Pacific Ins. Co.* emphasizes that despite coverage for intentional acts, coverage is excluded for damage expected or intended by the insured. (*Id.* at pp. 1565-1566.)

In our case, the alleged damage to Sherlin was the cessation of her electroplating business, located next door to Quintana's residence. We have reviewed the complaint and the evidence before the trial court in City's motion for summary judgment. We note City failed to present to the trial court the disputed ordinance, any minutes from the city council meetings, supporting declarations by city council members, or any evidence, to refute the allegations in Sherlin's complaint or the argument in the Authority's opposition. From the evidence before this court, we conclude the intended and expected result of City's passage of the anti-noise ordinance was economic damage to Sherlin's business. It is clear that City's activities fall outside the policy definition of occurrence, and, therefore, the scope of coverage. (See *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1 [44 Cal.Rptr.2d 370, 900 P.2d 619].) The Authority had no duty to defend or indemnify City.[17]

---

[17]We need not reach the issue of whether the Program included coverage for Sherlin's 42 United States Code section 1983 claims. A damage suit for violation of civil rights ordinarily would not be covered since a violation of section 1983 requires intentional acts by public officials acting under color of law in deprivation of rights protected by the Constitution. Conceivably, it might be possible for a lawsuit to be one involving both negligence and intentional acts under the Civil Rights Act. Generally, however, negligence is insufficient for a claim under section 1983. (See *Parratt* v. *Taylor* (1981) 451 U.S. 527 [68 L.Ed.2d 420, 101

## DISPOSITION

The judgment is reversed. Each party to bear its own costs on appeal.

Klein, P. J., and Croskey, J., concurred.

A petition for a rehearing was denied November 6, 1995, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 18, 1996.

S.Ct. 1908], overruled on other grounds in *Daniels* v. *Williams* (1986) 474 U.S. 327, 330 [88 L.Ed.2d 662, 667, 106 S.Ct. 662].) In addition, Moore's deposition testimony provided uncontraverted evidence that neither allegations of negligence nor claims of constitutional violations were matters that triggered coverage under the Program.