[No. A107574. First Dist., Div. Five. July 18, 2005.]

CITY OF LA MESA, Plaintiff and Appellant, v.
CALIFORNIA JOINT POWERS INSURANCE AUTHORITY, Defendant
and Respondent.

COUNSEL

Foley & Lardner, Kenneth S. Klein; and Aaron M. Schwarcz for Plaintiff and Appellant.

Lee A. Wood & Associates and Lee A. Wood for Defendant and Respondent.

OPINION

JONES, P. J.—City of La Mesa (City) appeals a summary judgment in favor of California Joint Powers Insurance Authority (JPIA) in its action to recover the balance of City's "equity account" held by JPIA. The JPIA was organized by the member public entities' joint powers agreement pursuant to Government Code section 6500 to provide a self-insuring pool as an alternative to private insurance. City was a member from 1987 until it withdrew in July 2002.

City disputes the enforceability of article 24(a) of the joint powers agreement, which provides that members' deposits shall not be returned upon withdrawal. Its challenge requires us to determine the applicability of Government Code section 6512.2, which authorizes contractual limitations on

the return of any surplus deposits. City argues section 6512.2 should not be applied retroactively to resurrect what it contends is a void clause.[1]

## BACKGROUND

*Joint Powers Authority Agreement*

■ Since 1949, the Joint Exercise of Powers Act has permitted two or more municipalities to form a joint powers authority which they agree will exercise any power that each municipality has power to exercise individually. (Gov. Code, § 6500 et seq.[2]; *City of South El Monte v. Southern Cal. Joint Powers Ins. Authority* (1995) 38 Cal.App.4th 1629, 1632 [45 Cal.Rptr.2d 729].) Municipalities are specifically authorized to enter into a joint powers agreement to insure against a broad range of liabilities through self-insurance. (§ 990.8.)

In 1977, a group of Southern California cities entered into an agreement (Agreement) to create JPIA, which would administer a joint protection program by which the member cities would pool their losses and claims and jointly purchase excess insurance and administrative and other services.[3]

City became a member of JPIA in August 1987. When it joined, section 6512 stated: "The [joint powers] agreement shall provide that after the completion of its purpose, any surplus money on hand shall be returned in proportion to the contributions made."

On January 29, 1997, the Agreement was amended to its present form at JPIA's board of directors meeting. Donald Dodson, City's risk manager, attended the meeting on City's behalf and voted to adopt the amended Agreement.

Article 16 of the amended Agreement provides that JPIA's executive committee shall determine each member's "initial deposit."[4] Article 16 also provides that the executive committee is required to adopt a cost allocation plan and formula to provide for an adjustment in the members' deposits at the

---

[1] The case was heard in Alameda County after the San Diego Superior Court, where the action was filed, granted JPIA's request for a change of venue.

[2] All further section references are to the Government Code.

[3] JPIA was originally called the Southern California Joint Powers Insurance Authority. It was given its present name on January 29, 1997, to reflect its geographical service area more accurately.

[4] The Agreement does not define "initial deposit," but, according to the parties, the term refers to the amount each member pays to JPIA at the beginning of each fiscal year, not the amount it pays to join JPIA.

end of each year "in order to produce a deposit for each year for each Member that is equal to the sum of" the amount of losses borne individually by the member, the member's share of pooled losses and other expenses, and the member's contribution to a catastrophe fund and reserves for incurred-but-not-reported losses. The deposit adjustments may be retrospective to the prior year, and each member is required to pay any additional deposit required by the retrospective adjustment.[5]

Article 24 of the amended Agreement, entitled "Effect of Withdrawal," states:

"(a) The withdrawal of any Member from this Agreement shall not terminate the same, and no Member by withdrawing shall be entitled to payment or return of any deposits, consideration or property paid, or donated by the Member to the Authority, or to any distribution of assets.

"(b) The withdrawal of any Member after the effective date of the joint protection program shall not terminate its responsibility to contribute its share of deposits or funds to any fund or insurance program created by the Authority until all claims, or other unpaid liabilities, covering the period the Member was a signatory hereto have been finally resolved and a determination of the final amount of payments due by the Member or credits to the Member for the period of its membership has been made by the Executive Committee. . . ."

Article 25 of the amended Agreement is entitled "Termination and Distribution." Subdivision (b) thereof states, in pertinent part, that upon termination of the Agreement, "all assets of the Authority shall be distributed only among the parties that have been Members of the joint protection program . . . in accordance with and proportionate to their cash (including deposits) payments and property (at market value when received) contributions made during the term of this Agreement."

Articles 24 and 25(b) contain the same substantive language that was contained in the version of the Agreement in effect when City joined JPIA in 1987. They differ only to the extent they have been renumbered and have substituted the word "member" for "city" and the word "deposits" for "premium."

---

[5] In their memoranda of points and authorities filed in this action, City stated that if a member's initial deposit exceeds its adjusted end-of-the-year deposit, the excess contribution is credited to the member's equity account, and JPIA stated that a member "might get a refund of past contributions" following the adjustment. Neither party supported these statements with citations to a document that describes the consequence of a deposit made at the beginning of the year that is greater than the adjusted deposit.

Neither the original nor the amended Agreement defines or refers to a member city's "equity." However, an information brochure produced by JPIA when it was still known as Southern California Joint Powers Insurance Authority, i.e., sometime before January 29, 1997, states that member deposits are "treated as their equity, and reduced only by claims and expenses actually paid." Two 1986 flyers, summarizing the comprehensive general and automobile liability coverage program and the workers' compensation coverage program, state that all deposits are credited to a member's equity account balance.

*Section 6512.2*

On February 28, 1997, one month after the agreement was amended, Senate Bill No. 1153 (1997–1998 Reg. Sess.) was introduced to add section 6512.2 to the Joint Exercise of Powers Act. The bill was enacted as a statute on July 28, 1997. The statute states that section 6512.2 is added to the Government Code, to read: "If the purpose set forth in the agreement is to pool the self-insurance claims of two or more local public entities, the agreement may provide that termination by any party to the agreement shall not be construed as a completion of the purpose of the agreement and shall not require the repayment or return to the parties of all or any part of any contributions, payments, or advances made by the parties until the agreement is rescinded or terminated as to all parties. The agreement may provide that after the completion of its purpose, any surplus money remaining in the pool shall be returned in proportion to the contributions made and the claims or losses paid." (Stats. 1997, ch. 131, § 2.)

The statute specifies that "[i]t is the intent of the Legislature that the provisions of this act shall not apply to any lawsuits filed on or before May 2, 1994." (Stats. 1997, ch. 131, § 3.)[6]

*Superior Court Proceedings*

City withdrew from JPIA effective July 1, 2002. It then sought the return of its "excess equity contributions," which it characterized as the monies it paid into the pool above the amounts necessary to cover its responsibilities. It claimed this sum exceeded $2 million. JPIA denied the request, based on article 24 of the amended Agreement.

In February 2003, City filed the present action. In multiple causes of action, including declaratory relief, breach of contract, and negligent misrepresentation, it sought the return of the balance of its equity account or a

---

[6] A 2001 amendment to section 6512.2 has no bearing on the section's application to this case. (Stats. 2001, ch. 38, § 2.)

declaration that JPIA was required to hold its equity in trust for the City until JPIA dissolved. It alleged generally that in years when a member's deposit to the JPIA exceeds the amount needed to pay claims and cover other expenses, JPIA "accounts for the excess, in whole or in part, in an 'equity' account in the name of the member." It further alleged that during its membership in JPIA, its total deposits and/or readjustments exceeded $8,365,700, and its total losses were less than $4,484,623, making its "equity balance" $2,687,733.

As affirmative defenses, JPIA alleged that every claim in City's complaint was barred as unenforceable, insofar as section 6512.2 permits a joint powers authority to limit a member's ability to recover deposit premiums; that City consented to and ratified the provisions of the Agreement that preclude a withdrawing member from receiving deposits or distribution of assets until the Agreement is terminated; and that City waived any breach because it had full knowledge of JPIA's policy that "equity interests and/or contributions by any members would not be returned to those members upon their withdrawal from the pooling agreement."

City moved for summary adjudication of JPIA's affirmative defenses on the grounds, inter alia, the Agreement was not amended on or after January 1, 1998, the date section 6512.2 took effect, and therefore City did not consent to or ratify any contractual restriction of its right to receive its equity contributions upon withdrawal, making section 6512.2 inapplicable to its action. JPIA moved for summary judgment on the grounds it was not obligated to return the balance of the amounts City had deposited, insofar as both article 24 of the Agreement and section 6512.2 prohibited City from recovering any contributions until the termination of JPIA. According to the supporting declaration of its executive director, the contributions in dispute were "based upon reserves of reported claims, actuarial estimates of incurred but unreported claims, and the expenses to adjust and litigate those claims."

The parties agreed to a consolidated hearing on their motions, insofar as they raised substantially similar facts and issues.

The trial court granted judgment for JPIA after concluding article 24(a) of the Agreement barred City's claims because section 6512.2 expressly permits such provisions in a joint powers agreement. It concluded section 6512.2 applied to the Agreement because it was retroactive to May 2, 1994, nine years before the present action was filed, and, even if not explicitly retroactive to May 2, 1994, was applicable because nothing in section 6512.2 limited it to joint powers self-insurance pools established or voluntarily modified after its effective date of January 1, 1998.

## DISCUSSION

*Standard of Review*

■ Summary judgment is properly granted if the moving papers show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) ■ In appeals from a summary judgment, appellate courts review the record and determination of the trial court de novo. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30].)

*Applicability of Section 6512.2*

City contends section 6512.2, effective January 1, 1998, is inapplicable to the Agreement as amended on January 29, 1997, because the statute is prospective only, insofar as it is not "explicitly" retroactive. City further contends that section 6512.2 is inapplicable to the Agreement because the statute was intended to apply to funds in a joint powers self-insurance pool that are akin to a commercial insurance company's "earned premiums." By contrast, City argues, the agreement and the parties' business practices establish that the money it seeks to recover is its "equity," which is different from the commercial insurer's "earned premiums."

As we understand the heart of City's contention, article 24(a), barring a refund of any deposits or assets upon a member's withdrawal from JPIA, is void as an illegal forfeiture, unless section 6512.2 is applicable to the Agreement. City argues that section 6512.2, with an effective date of January 1, 1998, cannot validate or resurrect a previously void clause.

To resolve the parties' disagreement on the disputed statute's effective date, on its retroactivity, and ultimately on whether it was intended to govern the JPIA agreement as amended and reaffirmed on January 29, 1997, we must apply well-established rules of statutory interpretation.

■ One such principle instructs that statutes are not to be given retrospective operation unless " 'it is clearly made to appear that such was the legislative intent.' " (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207 [246 Cal.Rptr. 629, 753 P.2d 585].) However, an express declaration that the Legislature intended a statute to have retroactive application is not necessarily required to show that the Legislature did so intend; extrinsic sources may make very clear that the Legislature intended to depart from the normal rule of prospectivity. (*Id.* at p. 1209; *Fox v. Alexis* (1985) 38 Cal.3d 621, 629 [214 Cal.Rptr. 132, 699 P.2d 309].)

Although the Legislature did not use the specific word "retroactive" (or any variants, e.g., "retroactively," "retrospective") when it enacted section 6512.2, its explicitly stated intent was that the statute "shall not apply to any lawsuits filed *on or before* May 2, 1994." (Stats. 1997, ch. 131, § 3, italics added.) Short of using the precise word "retroactive," it is difficult to conceive a more plainly manifested intent from this language other than that the Legislature, by denominating the exact date before which the newly enacted section 6512.2 was inapplicable, intended the logical corollary: the statute shall apply to lawsuits filed *after* that specified date.

■ City argues that the May 2, 1994 date was chosen simply so that the new statute would have no effect on a then pending San Diego lawsuit in which a hospital that had withdrawn from a joint powers self-insurance pool sought recovery of its contributions from the joint powers authority, and the date was a drafting strategy to insulate the statute from the constitutional proscription against special laws applicable only to particular persons, as opposed to general application. (Cal. Const., art. IV, § 16.) Were this court to accept City's argument, we would effectively be treating the statute as a special law, which, as City recognizes, would make it constitutionally infirm. Our mandate is to construe statutes to preserve their constitutionality, if feasible within the bounds of their language. (*Metromedia, Inc. v. City of San Diego* (1982) 32 Cal.3d 180, 186 [185 Cal.Rptr. 260, 649 P.2d 902].)

Furthermore, nothing in the statute reflects a legislative intent that, if a provision in a joint powers agreement executed before section 6512.2's effective date contained language authorizing the joint powers authority to retain excess contributions, it would be void after the enactment of section 6512.2, unless the joint powers authority formally readopted the provision.

■ The touchstone of statutory interpretation is the probable intent of the Legislature. Courts are to give a statute's words their plain, commonsense meaning. (*Bonnell v. Medical Board* (2003) 31 Cal.4th 1255, 1261 [8 Cal.Rptr.3d 532, 82 P.3d 740].) If the language is clear and unambiguous, the plain meaning controls, and there is no need for statutory construction or resort to other indicia of legislative intent, such as legislative history. (*Id.* at pp. 1261, 1264; *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].) The language of an unambiguous statute cannot be expanded by statements of a committee during the course of the legislative process. (*Kanter v. Warner-Lambert Co.* (2002) 99 Cal.App.4th 780, 791 [122 Cal.Rptr.2d 72].)

■ Here, section 6512.2 plainly states that an agreement by local entities to pool self-insurance claims may provide that one party's termination shall not require a return or repayment to that party of any of its contributions,

payments, or advances until the agreement is terminated as to all parties. Had the Legislature intended that an existing agreement already containing such a provision was no longer valid unless reaffirmed by the signatories to the agreement, it could readily have said so. In effect, City would have us rewrite the statute by including such a requirement. However, in interpreting a statute, courts do not insert what has been omitted; we do not, under the guise of construction, rewrite the law. (*California Fed. Savings & Loan Assn. v. City of Los Angeles, supra*, 11 Cal.4th at p. 349.) The amended Agreement of January 29, 1997, as JPIA acknowledges, contains a provision that mirrors section 6512.2: a withdrawing member is not entitled to payment or return of deposits (article 24(a)) until the termination of the Agreement, when all assets are distributed among the parties that have been members proportionate to their payments (article 25(b)). The enactment of section 6512.2 subsequent to the January 29, 1997 amended Agreement and challenged article 24(a) does not preclude enforcement thereof because the parties did not execute a postenactment reaffirmation of the Agreement.

The same principles of interpretation apply to City's contention that section 6512.2 was not intended to apply to agreements like the instant Agreement. It argues that, according to the legislative history, the "contributions" to which section 6512.2 refers are contributions akin to "earned premiums" in commercial insurance policies, whereas it seeks the return of its equity.

█ Again, the language of section 6512.2 is unambiguous: an agreement to pool self-insurance claims may provide that termination by a party "shall not require the repayment or return to the [terminating] parties of all or any part of any contributions, payments, or advances made by the parties . . . ." Indeed, City itself defines its "equity" as the monies it "paid" into the self-insurance pool above the amounts necessary to cover its responsibilities. Nothing in the statutory language manifests an intent to categorize contributions to the pool, so that some categories of deposits are deemed immediately refundable upon the contributing party's withdrawal from the agreement. Rather, the plain meaning is that any kind of contribution or payment, however characterized, may be retained until all parties to the agreement rescind or terminate it.

*Legislative History*

We also observe that, in fact, the legislative history of section 6512.2 supports our conclusions.

Senate Bill No. 1153 (1997–1998 Reg. Sess.), containing the proposed new section 6512.2, was introduced on February 28, 1997. Its sponsor was the California Association of Joint Powers Authorities. Senate Bill No. 1153 also

proposed amending section 990.8, which permits public entities to form a joint powers authority for self-insurance pooling, by adding subdivision (e): "Where a joint powers agreement authorized by this part or authorized [by] Section 6516 [governing insurance pooling arrangements for fairs and exhibitions] provides for the pooling of self-insured claims or losses among entities, if any peril insured or covered under contract has existed, and the joint powers authority or other parties to the pool have been liable for any period, however short, the party insured or covered under contract is not entitled to the return of premiums, contributions, payments, or advances so far as that particular risk is concerned, unless the agreement or contracts issued pursuant to the joint powers agreement expressly so provides." (Sen. Bill No. 1153 (1997–1998 Reg. Sess.) § 1.)

On May 1, 1997, Senate Bill No. 1153 was amended to add the specifically stated legislative intent that section 6512.2 "shall not apply to any lawsuits filed on or before May 2, 1994." (Sen. Amend. to Sen. Bill No. 1153 (1997–1998 Reg. Sess.) May 1, 1997, italics omitted.)

In an analysis prepared for a Senate Insurance Committee hearing on the bill, the analyst noted that the bill arose in response to a lawsuit against a joint powers authority, Program BETA Risk Management Authority, by Grossmont Hospital Corporation, which had been a member of Program BETA for 13 years. After Grossmont withdrew from Program BETA, it brought an action in 1992 to recover the difference between "all contributions paid and all claims paid out," and in November 1996 a superior court held that Grossmont's withdrawal must be allowed at any time without forfeiting its contributions, after an accounting and settlement of claims. (Sen. Com. on Insurance, Analysis of Sen. Bill No. 1153 (1197–1998 Reg. Sess.) as amended May 1, 1997, pp. 2, 3.)

The analyst further noted that, according to the bill's sponsor, the amount sought by Grossmont could be over $14 million, a sum that represented the "vast majority" of contributions during its 13-year membership, and the bill was necessary to clarify the obligations and responsibilities of governmental entities withdrawing from a joint powers self-insurance pooling authority, in light of the superior court ruling in the Grossmont case. The analyst noted that, according to the bill's author, the bill was not intended to affect the Grossmont lawsuit, hence the amendment to the bill to include the statement of intent regarding the May 2, 1994 date. The analyst added that another supporter of the bill, the Association of California Healthcare Districts, also asserted that the bill was necessary to make clear that contributions made to self-insurance pools are not refundable on withdrawal by a participant. (Sen. Com. on Insurance, Analysis of Sen. Bill No. 1153 (1197–1998 Reg. Sess.) as amended May 1, 1997, p. 3.)

At the conclusion of his analysis, the analyst raised a question regarding prospective application. "The [trial] court in [the Grossmont case] essentially found that under existing law the members of a joint powers pool had essentially an 'equity' interest in the assets of the pool rather than an interest akin to a forfeited 'earned premium,' and could cash in that equity upon withdrawing from the pool. While the sponsor has indicated that Senate Bill No. 1153 is only intended to have 'prospective effect in order to clarify the law for the future,' the bill in fact has retroactive application and would only exempt joint power pools involved in lawsuits filed on or before May 2, 1994.[7] Under Senate Bill No. 1153, it appears that public entities currently participating in joint power pools will forfeit their 'equity' stake without their prior consent. A bill that was truly intended to apply prospectively would only apply to joint power pools established after the effective date of this bill; existing joint power pools would have to voluntarily modify their operating agreements to convert their 'equity' interests into nonrefundable 'earned premium' status." (Sen. Com. on Insurance, Analysis of Sen. Bill No. 1153 (1197–1998 Reg. Sess.) as amended May 1, 1997, p. 3.)

A subsequent Senate floor analysis noted that the sponsor of the bill argued that the bill would make contributions to a pool nonrefundable to a particular withdrawing individual participant, but still potentially available upon dissolution of the entire pool, and that these funds would be akin to "earned premiums" and would be consistent with the assumption by governmental entities that their pool contributions are their obligation and remain with the pool even though an individual government entity might withdraw. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1153 (1997–1998 Reg. Sess.) as amended on May 14, 1997, p. 3.)

On May 22, 1997, the bill was again amended to rewrite the proposed subdivision (e) to section 990.8. With the amending language italicized, the revised subdivision (e) states: "Where a joint powers agreement authorized by this part . . . provides for the pooling of self-insured claims or losses among entities, if any peril insured or covered under contract has existed, and the joint powers authority or other parties to the pool have been liable for any period, however short, *the agreement may provide that* the party insured or covered under contract is not entitled to the return of premiums, contributions, payments, or advances so far as that particular risk is *concerned*." (Sen. Amend. to Sen. Bill No. 1153 (1997–1998 Reg. Sess.) May 22, 1997.)

---

[7] Nothing in the legislative history of section 6512.2 states or indicates why the Legislature designated May 2, 1994 as the date on or before which the statute would not apply. Inferentially the date is related to the Grossmont/Program BETA lawsuit, which, according to a Senate committee analyst, was filed in 1992.

Another Senate bill analysis, subsequent to the May 22 amendment, noted that the amending phrase "the agreement may provide" in section 990.8 addressed concerns of the Senate Insurance Committee that a party insured through a joint powers agreement could lose its right to any equity in a self-insured claims pool if the agreement was silent on the rights to withdraw such funds. "The [May 22] amendment [to section 990.8, subdivision (e)] instead requires that the insured parties must agree through their contract that such funds cannot be withdrawn." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1153 (1997–1998 Reg. Sess.) as amended May 22, 1997, pp. 1, 2.)

On May 27, 1997, the bill passed the Senate unanimously and was sent to the Assembly. An analysis prepared for an Assembly committee hearing reiterated the notes and comments in the senate analyses. The Assembly analysis also noted that, according to the sponsor, the bill was intended to clarify present law and make member equity contributions to pools subject to contractual agreements, but was not intended to cut off or interfere with any legal action. "Therefore, with the consent of both parties participating in the [Grossmont/Program BETA] action, the bill will have prospective effect in order to clarify the law for the future." (Assem. Com. on Insurance Analysis of Sen. Bill No. 1153 (1997–1998 Reg. Sess.) as amended May 22, 1997, pp. 1, 2.)

The Assembly made no revisions to the bill and passed it unanimously as it was received from the Senate. After approval by the Governor, it was chaptered on July 28, 1997. (Stats. 1997, ch. 131, §§ 1–3.)

As this history shows, the substantive language of the bill to add section 6512.2 was unchanged during the six months from its introduction to its enactment, notwithstanding observations by analysts that the bill appeared to result in public entities that currently participated in joint powers authority self-insurance pools forfeiting their "equity" if they withdrew. The bill consistently stated that a joint powers authority agreement "may provide" that a withdrawing party was not entitled to a return of contributions. In our view, this consistency reflects a legislative intent to validate existing self-insurance pooling agreements that contain a provision proscribing the return of contributions to a withdrawing public entity, not an intent to require that such existing provisions had to be readopted to be effective.

## DISPOSITION

The judgment is affirmed.

Stevens, J., and Simons, J., concurred.