Filed 11/20/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SAN DIEGO et al.,<br><br>    Defendants and Respondents. | D067127<br><br><br>(Super. Ct. No. 37-2014-00009217-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge. Affirmed.

Briggs Law Corporation, Cory J. Briggs and Anthony N. Kim for Plaintiff and Appellant.

Jan I. Goldsmith, City Attorney, Daniel F. Bamberg, Assistant City Attorney, Meghan Ashley Wharton and Laura M. Depoister, Deputy City Attorneys, for Defendants and Respondents.

The issue in this appeal is whether a lease-back financing plan the City of San Diego (City) adopted to fund public infrastructure improvements violates state and local

requirements that municipal indebtedness exceeding annual income and revenue be approved by a two-thirds vote of the electorate. (Cal. Const., art. XVI, § 18(a); San Diego City Charter, art. VII, § 90(a); hereafter section 90(a).) San Diegans for Open Government (SDOG) contends the court erred by entering judgment against it in this reverse validation action on the ground the debt limitation provisions are inapplicable under *Rider v. City of San Diego* (1998) 18 Cal.4th 1035 (*Rider*) because the bonds will not be issued by the City, but by a separate public entity formed under a joint powers agreement. SDOG asserts *Rider* is factually distinguishable from this case in numerous respects, and thus it is inapplicable. SDOG also assigns error to several issues unrelated to *Rider.* We are unpersuaded by SDOG's positions, and thus we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[1]

In 1958, the City created the Redevelopment Agency of the City of San Diego (Redevelopment Agency). In 1991, the City and the Redevelopment Agency formed a joint powers authority called the Public Facilities Financing Authority of the City of San Diego (Financing Authority), pursuant to the Joint Exercise of Powers Act (Gov. Code, § 6500 et seq.). The Financing Authority is a separate public entity. (Gov. Code, §§ 6503.5, 6507.)

In 2011, legislation was enacted that required the dissolution of the state's redevelopment agencies. (Assem. Bill Nos. 26 & 27 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, chs. 5-6 (hereafter Assembly Bill 26 and

---

[1]     The parties stipulated to the material facts.

2

Assembly Bill 27).)[2] As of February 1, 2012, the Redevelopment Agency was dissolved. On that date, a successor agency (Successor Agency) the City established in conformance with Health and Safety Code section 34173, assumed the Redevelopment Agency's assets, rights and obligations, and became responsible for winding up its affairs. "A successor agency is a separate public entity from the public agency that provides for its governance and the two entities shall not merge." (Health & Saf. Code, § 34173, subd. (g).) The nine members of the San Diego City Council (City Council) serve as the Successor Agency's governing board. Further, the Successor Agency has an oversight board with seven members, two of whom the City appoints.

Effective January 1, 2013, the City, the Successor Agency, and the Housing Authority of the City of San Diego (Housing Authority) entered into a Third Amended and Restated Joint Exercise of Powers Agreement (Third JPA) to reconstitute the Financing Authority. The Housing Authority is a state agency created in conformance with the Housing Authorities Law (Health and Saf. Code, § 34200 et seq.). A housing authority is a separate public entity. The governing body of the Housing Authority consists of the nine members of the City Council.

---

[2] *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 241 (*Matosantos*) explains: "Responding to a declared state fiscal emergency, in the summer of 2011 the Legislature enacted two measures intended to stabilize school funding by reducing or eliminating the diversion of property tax revenues from school districts to the state's community redevelopment agencies." "Assembly Bill . . . 27 offers an alternative[ to dissolution]: redevelopment agencies can continue to operate if the cities and counties that created them agree to make payments into funds benefiting the state's schools and special districts." (*Ibid.*)

The Third JPA provides the agreement was made "for the purpose of . . . financing of certain public capital facilities improvements . . . ." It also provides: "The Bonds, together with the interest and premium, if any, thereon, shall not be deemed to constitute a debt of the City, the Successor Agency or the Housing Authority or pledge of the faith and credit of the City, the Successor Agency, [or] the Housing Authority. . . . The Bonds shall be only special obligations of the [Financing] Authority, and the [Financing] Authority shall under no circumstances be obligated to pay the Bonds or the respective project costs except from revenues and other funds pledged therefor." The Third JPA acknowledges that the Successor Agency "will terminate pursuant to State law at some future date and that a joint exercise of powers agreement must have at least two members."

In February 2014, the City Council adopted an ordinance that authorizes the Finance Authority's issuance of lease revenue bonds (2014A Bond Series) of up to $130 million (for a net of $120 million) under the Marks-Roos Local Bond Pooling Act of 1985 (Marks-Roos Act; Gov. Code, § 6584 et seq.) to finance various public capital improvements or projects. The City Council also passed a resolution that identifies more than 20 projects to be funded by the bonds, including fire stations, a lifeguard station, libraries, sidewalks, and storm drains.

The 2014A Bond Series financing is based on a lease-back arrangement. The City owns properties that were already the subject of lease agreements between it and the Financing Authority, including a police vehicle maintenance facility, a City operations building, and the Evan V. Jones Parkade. Under an amended site lease, the City will

4

lease these properties to the Financing Authority for nominal rent, and under an amended facilities lease, the Financing Authority will lease the properties back to the City for an amount equal to the annual debt service on the bonds.

SDOG brought a reverse validation action (Code Civ. Proc., § 860 et seq.) against the City, the Successor Agency, the Housing Authority, and the Financing Authority.[3] The complaint alleged the financing plan "is an artifice designed to circumvent" article XVI, section 18(a), of the California Constitution, which prohibits a city from "incur[ring] any indebtedness . . . exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors," and section 90(a), which imposes a similar two-thirds vote requirement.

The court denied SDOG any relief. It determined that *Rider* governs and under that opinion the debt limitation is inapplicable to the 2014A Bond Series financing because the Financing Authority is a separate public entity. The court disagreed with SDOG's argument that the Financing Authority is not legally autonomous, and thus its debt is actually a debt of the City.

DISCUSSION

I

*Subject Matter Jurisdiction*

Preliminarily, we address the City's contention the judgment is void because the trial court lacked subject matter jurisdiction. Under Government Code section 6599,

---

[3]     For ease of reading, we refer to defendants collectively as the City when the context permits.

subdivision (a) the plaintiff in a validation action or reverse validation action is required to serve a copy of the complaint on the Attorney General and the Treasurer "by the first day of the publication of summons as required by Section 861 of the Code of Civil Procedure." Here, the summons was first published on April 4, 2014, and SDOG served the Attorney General and the Treasurer on July 11, 2014. The City moved for judgment on the pleadings, and the court denied the motion on the ground late service caused no harm. The Attorney General and the Treasurer were served three months before the hearing, and they had ample time to intervene but opted not to do so.[4]

" ' "Subject matter jurisdiction . . . is the power of the court over a cause of action or to act in a particular way." ' " (*Saffer, supra,* 225 Cal.App.4th at p. 1248.) " 'Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' " (*People v. National Automobile and Casualty Ins. Co.* (2000) 82 Cal.App.4th 120, 125.) "When a court lacks jurisdiction in a fundamental sense, an ensuing judgment is void, and 'thus vulnerable to direct or collateral attack at any time.' " (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 660.)

"Questions of subject matter jurisdiction are questions of law, which are reviewed de novo." (*Tearlach Resources Limited v. Western States Internat., Inc.* (2013) 219

---

4       SDOG erroneously asserts the City may not raise the issue of subject matter jurisdiction because it did not appeal the court's denial of its motion for judgment on the pleadings. "[A]n alleged lack of subject matter jurisdiction must be addressed whenever it comes to a court's attention[,]" and a "respondent may raise the issue in a respondent's brief." (*Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1246 (*Saffer*); *Totten v. Hill* (2007) 154 Cal.App.4th 40, 46-47.)

6

Cal.App.4th 773, 780.)  Matters of statutory interpretation are also subject to de novo review.  (*Bean v. Pacific Coast Elevator Corp.* (2015) 234 Cal.App.4th 1423, 1427.)

A public agency may test the legal validity of certain of its acts by filing an in rem action within 60 days.  (Code Civ. Proc., § 860.)  If the public agency takes no action, "any interested person" may file a reverse validation action to challenge the validity of an act, within the same 60-day period.  (*Id.*, § 863.)

"[P]ublication is the primary means of notice in a validation case."  (*Katz v. Campbell Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1035 (*Katz*); *Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 921 [jurisdiction over "interested parties" "may be had by publication of summons"].) "In a reverse validation action, the summons must be (1) in the prescribed form, (2) directed to all persons interested in the matter and to the public agency, and (3) published for the period and in the manner required by statute."  (*Protect Agricultural Land v. Stanislaus County Local Agency Formation Com.* (2014) 223 Cal.App.4th 550, 559; Code Civ. Proc., §§ 861, 861.1.)

"In a validation action the thing that is the subject of the action is the matter to be validated, i.e., the ordinance, resolution, or other action taken by the public agency.  The only way for the court to acquire jurisdiction over the matter is to ensure that notice is given to all interested persons so that the resulting judgment can be conclusive as against them.  [Citation.]  Notice is provided by publishing the summons in a particular form, within a specified [time frame], and specifying a date for response.  Jurisdiction is not 'complete' until 'after the date specified in the summons.'  ([Code Civ. Proc.,] § 862.)

7

Failure to publish a summons in accordance with the statutory requirements deprives the court of jurisdiction over 'all interested parties' ([Code Civ. Proc.,] § 861), which deprives the court of the power to rule upon the matter. The Legislature has given the trial court power to permit a plaintiff to cure the defect if the plaintiff can demonstrate good cause. ([Code Civ. Proc.,] § 863.) But the court cannot overlook a defective summons. Unless the plaintiff has published a summons in compliance with the statutory requirements, the court has no jurisdiction to rule upon the matter that is the subject of the action." (*Katz, supra,* 144 Cal.App.4th at pp. 1031-1032.)

The City does not dispute that SDOG satisfied the publication requirements for its reverse validation action. Rather, the City asserts Government Code section 6599, subdivision (a) sets forth an additional *jurisdictional* requirement in validation proceedings pertaining to Mark-Roos Act bonds.

Subdivision (b) of Government Code section 6599 designates the Attorney General and the Treasurer as "interested persons" in a validation proceeding brought "to determine the validity of any authorizing bonds or the issuance of bonds." Subdivision (a) of Government Code section 6599 provides: "In an action . . . to determine the validity of any matter of an authority governed by this article, the authority and any interested person shall serve the Attorney General and the Treasurer with a copy of the complaint filed by the respective party by the first day of the publication of summons as required by Section 861 of the Code of Civil Procedure. A court may render no judgment in the matter or grant other permanent relief to any party except on proof of service of the Attorney General and the Treasurer *as required by this section*." (Italics added.) The

8

City asserts the italicized language plainly shows that an action must be dismissed as a matter of law for lack of subject matter jurisdiction if service was not made within the allotted time.

"As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' " (*People v. Murphy* (2001) 25 Cal.4th 136, 142.)

Further, "[o]ur Supreme Court has said, 'Where the interpretation claimed leads to injustice, oppression or to absurd consequences, the general terms used in a statute will be limited in their scope so as to avoid such a result.' [Citation.] The court has added that it is ' "presumed the Legislature intended reasonable results consistent with its expressed purpose, not absurd consequences." ' [Citation.] Even 'the literal meaning of the words may be disregarded to avoid absurd results.' " (*Lyles v. Sangadeo-Patel* (2014) 225 Cal.App.4th 759, 765, quoting *People v. Ventura Refining Co.* (1928) 204 Cal. 286, 290.) When it appears that a literal interpretation of a statute may lead to absurd results,

a review of the legislative history is proper.  (*Roger Cleveland Golf Co., Inc. v. Krane & Smith, APC* (2014) 225 Cal.App.4th 660, 677-678.)

As the trial court noted, Government Code section 6599, subdivision (a) does not expressly require dismissal absent strict compliance with the time limitation for service of a copy of the complaint on the Attorney General and the Treasurer.  In contrast, Code of Civil Procedure section 863 requires that a validation proceeding "shall be forthwith dismissed" for the failure to cause the publication of a proper summons within the allotted time, absent a showing of good cause.

" ' "It is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes." ' "  (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1108.)  The legislature could have explicitly mandated dismissal for the failure to strictly comply with the time limit specified in Government Code section 6599, subdivision (a) if that was its intent, but it did not do so.  Further, it is difficult to reconcile Code of Civil Procedure section 863, which does not require dismissal *as a matter of law* for noncompliance, with the City's interpretation of Government Code section 6599, subdivision (a).  We see no logical reason to allow leniency in one instance but not the other.

As the court also noted, the history of Assembly Bill No. 2300 (Assembly Bill 2300) does not suggest the Legislature intended the result the City urges.  Government

10

Code section 6599 was added in 2000 as part of Assembly Bill 2300. (Stats. 2000, ch. 723, § 5.) Assembly Bill 2300 was intended to "[c]lose[] loopholes in the sale of land-based municipal bonds issued by 'roving' joint powers authorities (JPAs)." (Assem. Com. on Local Gov., Analysis of Assem. Bill No. 2300 (1999-2000 Reg. Sess.) as amended April 27, 2000, p. 1.) The legislative history explains that roving JPAs were established to sell bonds under the Mark-Roos Act for the financing of projects by developers in exchange for substantial fees, the projects may be located at a "considerable distance from the geographic boundaries of any local agency belonging to the JPA," and "[u]nlike other JPAs, a roving JPA has no vested interest in the securities issued nor in the development [that] the securities supposedly financed." (*Id.* at p. 2.) According to the Treasurer, roving JPAs "have been used to finance highly speculative projects that cannot obtain financing through regular channels. This poses a threat to the 'market's' confidence in California's municipal bonds." (*Ibid.*)

In addition to adding Government Code section 6599, Assembly Bill 2300 amended Government Code section 6586.5, and added Government Code sections 6586.7 and 6599.2 and Code of Civil Procedure section 867.5. Under Government Code section 6586.5, subdivision (a)(1), bonds may not be authorized unless the "public capital improvement is to be located within the geographic boundaries of one or more local agencies of the authority . . . ." Government Code section 6586.7, subdivision (a) requires that a copy of a resolution authorizing an issuance of bonds "shall be sent by certified mail to the Attorney General and the California Debt and Investment Advisory Commission not later than five days after adoption by the authority."

11

Government Code section 6599.2 authorizes the Attorney General and the Treasurer to "jointly or separately" file an action under the validation statutes (Code Civ. Proc., § 860 et seq.). Code of Civil Procedure section 867.5, subdivision (a) provides: In the event that an action is brought by a public agency pursuant to this chapter, and that public agency later dismisses the action after any party has answered, then, notwithstanding Section 863, the party that answered may file an action pursuant to this chapter within 30 days after the public agency's dismissal was filed by the court. The legislative history explains that some roving JPAs filed validation actions to test their authorization of Marks-Roos Act bonds, but dismissed them if a challenge was raised, a tactic intended to evade court review. (Sen. Local Gov. Com., Analysis of Assem. Bill 2300 (1999-2000 Reg. Sess.) July 5, 2000, p. 2.)

As to Government Code section 6599, subdivision (a), the legislative history states: "Statutory procedures govern the filing and timing of validation suits. State officials say that they don't hear about validation suits over roving joint powers agencies' Marks-Roos Act bonds *until it's too late to respond effectively*. [Assembly Bill] 2300 requires a JPA to serve the Attorney General and the State Treasurer with copies of their validation suits. Assembly Bill 2300 prohibits a court from granting permanent relief in a validation suit without proof that state officials were served." (Sen. Local Gov. Com., Analysis of Assem. Bill 2300 (1999-2000 Reg. Sess.) July 5, 2000, p. 2, italics added.)[5]

_____

[5] Assembly Bill 2300 provides: "The Legislature hereby finds and declares that the municipal finance market in California is a matter of great public importance. Thus, it is of great public importance to ensure that the California municipal bond market remains a

Under the City's theory, an action would be subject to mandatory dismissal if service on the Attorney General and the Treasurer was even a day late and no prejudice resulted, i.e., they had sufficient time to intervene or perhaps even did intervene. We cannot reasonably attribute that intent to the Legislature, particularly because the validation statutes "implement[] important policy considerations." (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842.) " 'Assurance as to the legality of the proceedings surrounding the issuance of municipal bonds is essential before underwriters will purchase bonds for resale to the public.' " (*Ibid.*) Indeed, in Assembly Bill 2300, the Legislature actually expressed a preference for resolution on the merits, as it sought to preclude a JPA from eluding court scrutiny by filing and then dismissing a validation action after a challenge was raised.

To any extent a literal interpretation of Government Code section 6599, subdivision (a) supports the City's position that it requires dismissal as a matter of law when service on the Attorney General and Treasurer was late, we decline to adopt the interpretation because it would lead to unintended and absurd results. The time for service set forth in the statute is mandatory and should, of course, be observed. However, "[m]ost procedural steps, including those regarded as 'mandatory,' are not jurisdictional. Errors or omissions in compliance with them are not fatal to the fundamental subject

viable means of financing needed public improvements for all levels of government in the state. The Legislature enacts this act with the intent to protect the integrity of that market by prohibiting certain risky practices in the issuance of bonds. The Legislature further enacts this act with the intent to protect the public's interest, including protecting the public from the potential or actual confusion of deception in the issuance and purchase of those bonds." (Historical and Statutory Notes, 32A pt. 3 West's Ann. Gov. Code (2008 ed.) foll. § 6599, p. 155.)

matter jurisdiction of the court [citation] or to its jurisdiction to act." (2 Witkin, Cal. Procedure (5th ed. 2008) Jurisdiction, § 290, p. 898; *In re Marriage of Harris* (1977) 74 Cal.App.3d 98, 102.)

We conclude that when the Attorney General and the Treasurer have actually been served with a copy of the complaint, and no prejudice is shown, the court has the discretion under Government Code section 6599, subdivision (a) to excuse the time limitation. "Discretion is abused when its exercise is arbitrary, whimsical, or capricious." (*In re Marriage of Battenburg* (1994) 28 Cal.App.4th 1338, 1343.) The City does not suggest the court's ruling constitutes abuse of discretion. SDOG served all interested persons by publishing a proper summons, and thus the court had jurisdiction over the subject matter of the in rem proceeding. (*Katz, supra,* 144 Cal.App.4th at pp. 1031-1032.)[6]

---

6   We deny SDOG's motion for judicial notice of "the State of California Department of Justice Office of the Attorney General's 'Service on the Attorney General' [Web site]," and a document filed in another San Diego County Superior Court case (No. 37-2012-00086572-CU-MC-CTL) in which SDOG was the plaintiff and the City was the defendant, as these documents are unnecessary to our decision on the Government Code section 6599 issue.

14

## II

### *Analysis of Merits*

### A

### Rider *Opinion and Attempts to Distinguish It*

#### 1

SDOG contends the court erred by finding the finance plan does not violate state and local debt limitation provisions. The state constitution provides: "No *county, city, town, township, board of education, or school district*, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose . . . ." (Cal. Const., art. XVI, § 18(a), italics added.) "Enacted in response to concern over excessive municipal indebtedness, the provision provided an instrument to control local borrowing and established the 'pay-as-you-go' principle in municipal finance." (*City of San Diego v. Rider* (1996) 47 Cal.App.4th 1473, 1481 (*City of San Diego*).) Similarly, section 90(a) requires a two-thirds vote when the cost of bonded indebtedness "will be too great to be paid out of the ordinary annual income and revenue of [the] City."

The trial court determined *Rider* resolves the matter against SDOG. In *Rider,* the plaintiffs (collectively, Rider) brought a reverse validation action to challenge a financing plan in which the San Diego Unified Port District (Port District), owner of the San Diego Convention Center (Convention Center), and the City, operator of the Convention Center, entered into a joint powers agreement to create a financing authority; the Port District

15

agreed to lease the existing Convention Center and the site of a planned expansion to the financing authority for $2; the financing authority arranged to issue lease revenue bonds not to exceed $205 million to cover the cost of the expansion and financing costs; the financing authority agreed to sublease the Convention Center and the expansion to the City in exchange for the City's payment of "rent equal to the debt service on the bonds," and; the Port District agreed to pay the City $4.5 million annually for 20 years to help the City meet its obligations to the Port District and the financing authority. (*Rider, supra,* 18 Cal.4th at p. 1040.)

Rider argued the plan violated the debt limitation provisions because the financing authority had "no existence independent of the City, but rather [was] a mere financing 'shell' that acts at the City's behest, doing for the City what the City may not do in its own name." (*Rider, supra,* 18 Cal.4th at p. 1041.) The City obtained summary judgment and this court affirmed. (*Ibid.*) "Because of the widespread use of similar financing plans throughout the state, and because any doubt about the validity of these financing plans could impact the cost of capital for the improvement of public resources," the Supreme Court granted review. (*Ibid.*)

*Rider* affirmed the judgment. (*Rider, supra,* 18 Cal.3d at pp. 1055-1056.) The opinion explained: "The short answer to plaintiffs' argument is that the Constitution and the City's charter permit the City to avoid the two-thirds vote requirement *by creating a joint powers agency to finance public works projects.* Therefore, however we might characterize the financing plan at issue here, we cannot characterize it as unlawful." (*Rider,* at p. 1042, italics added.)

16

*Rider* elaborated that article XVI, section 18(a) of the California Constitution "lists six specific types of governmental entities that may not incur indebtedness without a two-thirds vote, and, though plaintiffs might wish otherwise, joint powers agencies are not on the list.  Similarly, though the City's charter places restrictions *on the City* when it incurs certain debt, nothing in that charter indicates that those restrictions apply to a *joint powers agency* that the City might create." (*Rider, supra,* 18 Cal.4th at p. 1043.)  Article XVI, section 18(a) "includes no broad term analogous to 'special district' that might encompass entities, such as joint powers agencies, that a city or county creates and controls." (*Rider,* at p. 1044.)

*Rider* explained that the Supreme Court had "long held that the debt limitation in [article XVI,] section 18 does not apply *when a local government enters into a contingent obligation*.  'A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens.  [Citation.]' [Citations.] . . . [¶]  Local governments have taken advantage of this principle to enter into lease-purchase agreements without obtaining the approval of two-thirds of the electorate, and we have upheld these arrangements." (*Rider, supra,* 18 Cal.4th at p. 1047, italics added.)

For instance, *City of Los Angeles v. Offner* (1942) 19 Cal.2d 483 (*Offner*) approved a plan under which the city would lease land to a private party for $1 per month, and the private party would construct an incinerator on the land and lease the land and the incinerator back to the city for a monthly rental to be determined by competitive bid. (*Rider, supra,* 18 Cal.4th at p. 1047.)  "At various intervals, the city would have the option of purchasing the incinerator at its then appraised value, subject to certain

17

limitations." (*Ibid.*)  Under those circumstances, the court "held that the two-thirds vote requirement did not apply, rejecting the argument that the lease would be in essence a sales contract with payment of the purchase price in a series of installments."  (*Ibid.*)  The court noted the lease terms were reasonable, the city never had the right to purchase the incinerator at less than its market value, and " 'the city is not required to exercise the option in order to protect its prior investment in the form of rental payments.' "  (*Ibid.*)

*Rider* observed that in *Dean v. Kuchel* (1950) 35 Cal.2d 444 (*Dean*), "we significantly broadened our holding in *Offner,* approving a financing plan that has many of the characteristics of the financing plan now before us.  Significantly, we applied *Offner* although the transaction involved an automatic transfer of title at the end of the lease term, not an option to purchase at fair market value.  Thus, the rent payments in *Dean* looked much more like installment payments on the purchase price than did the rent payments in *Offner*."  (*Rider, supra,* 18 Cal.4th at pp. 1047-1048.)[7]

*Rider* also explained that "the financing arrangements in this case insulate the City in a real economic sense from prohibited 'indebtedness.'  The City is required to pay each year only for its use of the Convention Center during that year; the City's obligation to pay rent abates if, for any reason, it loses use of the property; and the [f]inancing [a]uthority has waived any right to accelerated payment of rent in the event of breach.

---

7    In *City of San Diego, supra,* 47 Cal.App.4th at page 1478, this court observed that under "Supreme Court authority referred to as the *Offner-Dean* rule, a public entity may incur contractual liability without voter approval and not offend the constitutional debt limitation if the contract 'creates no immediate indebtedness for the aggregate installments, . . . confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year . . . .' "

Thus, the City has not assumed a large, multiyear indebtedness comparable to the [f]inancing [a]uthority's debt. Because the [f]inancing [a]uthority has a genuine separate existence from the City [citation], it does not matter whether or not the City 'essentially controls' the [f]inancing [a]uthority." (*Rider, supra,* 18 Cal.4th at p. 1044.)

In *Rider,* the court added: "We are not naive about the character of this transaction. If the City had issued bonds to pay for the Convention Center expansion, the two-thirds vote requirement would have applied. Here, the City and the Port District have created a financing mechanism that matches as closely as possible (in practical effect, if not in form) a City-financed project, but avoids the two-thirds vote requirement. Nevertheless, the law permits what the City and the Port District have done. Plaintiffs are correct that this conclusion allows local governments to burden taxpayers with potentially high costs that voters have not approved, but local governments impose similar burdens on taxpayers every time they enter into long-term leases involving property of substantial value. We have long held that the two-thirds vote requirement does not apply to these leases so long as the obligation to pay rent is contingent on continued use of the leased property." (*Rider, supra,* 18 Cal.4th at p. 1055.)

2

SDOG contends "the structure of the financing at issue here is so very different from the structure approved in *Rider* that *Rider* does not compel a ruling against [SDOG]." SDOG submits that *Rider* is distinguishable because here there is more "governance overlap." SDOG characterizes the relationship among the City, the Successor Agency, and the Housing Authority as "incestuous."

19

SDOG points out that in *Rider*, the joint powers agreement that created the financing authority consisted of the Port District, an "independent governmental entity" (*Rider, supra,* 18 Cal.4th at pp. 1039-1040), and the City, whereas here the Third JPA that created the Financing Authority consists of the City and two of its own entities, the Successor Agency and the Housing Authority. Further, in *Rider* one-half of the financing authority's governing board was comprised of the City's mayor and manager (*id.* at p. 1042), whereas here, the Financing Authority's governing board is comprised exclusively of City Council members, as are the governing boards of the Successor Agency and the Housing Authority. Additionally, the Financing Authority's secretary is the City's clerk, its treasurer/controller is the City's chief financial officer, and its general counsel is the City Attorney.[8] SDOG also points out that the Financing Authority has never owned tangible property, and "never in its own name entered into any contract that was not a component of a broader transaction involving bonded indebtedness."

SDOG asserts the 2014A Bond Series is subject to the two-thirds vote requirement because the Financing Authority is a "subordinate agency" of the City. The Legislature, however, has specified that the Financing Authority, along with the Successor Agency and the Housing Authority, are all public entities legally separate from the City. (Gov. Code, § 6507; Health & Saf. Code, §§ 34173, subd. (g), 34240; *Housing Authority of City*

---

[8]    SDOG claims "the City retained and paid for bond counsel" for the Series 2014A Bond Series, and thus the City "has assumed legal and financial responsibility" for the Financing Authority. SDOG cites Section 6 of Ordinance No. O-20350, but it does not state the City would pay for bond counsel. The City cites a staff report that states the fees for bond counsel were to be "paid out of bond proceeds."

*of Los Angeles v. City of Los Angeles* (1952) 38 Cal.2d 853, 861 (*Housing Authority of City of Los Angeles*).) In *Rider,* the court rejected the argument the financing authority formed to issue bonds for the Convention Center expansion was the "alter ego" of the City based on its control over the financing authority. (*Rider, supra,* 18 Cal.4th at p. 1043.) The court explained the financing authority, not the City, issued the bonds, and by law the financing authority's debts were not the City's debts. (*Id.* at p. 1045, citing Gov. Code, §§ 6508.1, 6551.) Further, the bonds themselves provided they were not obligations of the City, and bondholders must look exclusively to the financing authority for payment. (*Rider,* at p. 1045.)

*Rider* relied on *Vanoni v. County of Sonoma* (1974) 40 Cal.App.3d 743 (*Vanoni*), in which the plaintiffs argued the Sonoma County Flood and Water Conservation District (district) was indistinguishable from the County of Sonoma (county) for purposes of the constitutional debt limitation. (*Id.* at p. 748.) The district's geographical boundaries were coterminous with the county's, the county board of supervisors sat ex officio as the governing board of the district, lower level county employees sat ex officio as officials of the district, and the district performed traditional county functions. (*Id.* at pp. 745-746, 748-749.) The court rejected the argument because the district "is a legal entity separate from the county and created by act of the Legislature as a body corporate and politic." (*Id.* at p. 749.)

*Vanoni* also explained that while the district "may be performing functions traditionally performed by counties, [the plaintiffs] have offered no evidence, beyond the fact that the same individuals sit on the governing boards of both the county and

21

the . . . district, that [the county] exercises actual control over the actions of the district." (*Vanoni, supra,* 40 Cal.App.3d at p. 750.) *Vanoni* held: "The fact that the same individuals are members of both boards is not sufficient to establish that control. [Citation.] Because [the county] neither assumed any obligation for the district's contractual obligation to the United States nor controlled the district's decision to incur that obligation, the constitutional limitation on county indebtedness does not apply to the indebtedness of the district." (*Id.* at pp. 750-751.)

The City cites *Pacific States Enterprises, Inc. v. City of Coachella* (1993) 13 Cal.App.4th 1414, 1424, which observed: "Well-established and well-recognized case law holds that the mere fact that the same body of officers acts as the legislative body of two different governmental entities does *not* mean that the two different governmental entities are, in actuality, one and the same." (Citing *County of L.A. v. Continental Corp.* (1952) 113 Cal.App.2d 207, 219-220 [county and local flood control district were separate legal entities even though both were governed by county's board of supervisors]; *Riverside etc. Dist. v. Jos. W. Wolfskill Co.* (1957) 147 Cal.App.2d 714, 717-718 [same].)

The City also cites *Tucker Land Co. v. State of California* (2001) 94 Cal.App.4th 1191, which rejected the argument that the members of a JPA were liable under an alter ego theory for the contractual obligations of the JPA. The joint powers agreement there "made provision for the executive officer of one of the constituents to serve in the same capacity for the JPA, and the general manager of another constituent to serve as the treasurer." (*Id.* at p. 1202.) *Tucker* explained this arrangement was not irregular, as Government Code section 6506 "specifically permits one organization to administer the

22

[joint exercise of powers agreement], or conduct the services for the others." (*Ibid.*)[9]

The court noted "[t]here is no evidence of abuse of organizational formalities, or of any diversion of funds. There is no evidence that any fraud was perpetrated . . . ." (*Ibid.*)

*Rider* is factually distinguishable to some degree, but we conclude the differences are immaterial. *Rider* made clear that for purposes of the debt limitation provisions, when a financing authority created to issue bonds "has a genuine separate existence from the City," "it does not matter whether or not the City 'essentially controls' the [f]inancing [a]uthority." (*Rider, supra,* 18 Cal.4th at p. 1044.) "As an intermediate court, we are bound to follow Supreme Court precedent." (*Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1021.) We cannot reasonably interpret *Rider* to apply only when the members of a JPA have a more attenuated connection than they do here, as SDOG urges.

Under the Joint Exercise of Powers Act, the Financing Authority has a genuine separate existence from the City. (Gov. Code, §§ 6503.5, 6507, 6551.) The Successor Agency and the Housing Authority also have genuine separate existences from the City. (Health & Saf. Code, §§ 34173, subd. (g) ["A successor agency is a separate public entity

---

9    Government Code section 6506 provides: "The agency or entity provided by the agreement to administer or execute the agreement may be one or more of the parties to the agreement or a commission or board constituted pursuant to the agreement or a person, firm or corporation, including a nonprofit corporation, designated in the agreement. One or more of the parties may agree to provide all or a portion of the services to the other parties in the manner provided in the agreement. The parties may provide for the mutual exchange or services without payment of any consideration other than such services." Similarly, Government Code sections 6505.5 and 6505.6 provide that a public officer of one of a financing authority's member agencies may serve as the treasurer and controller of the financing authority.

23

from the public agency that provides for its governance and the two entities shall not merge."], 34240 [a housing authority is "a public body corporate and politic"]; *Housing Authority of City of Los Angeles, supra,* 38 Cal.2d at p. 861 [a housing authority "is not an agent of the city in which it functions"].) In recognition of the separate status, the Third JPA specifies that bonds are not a debt of the City, the Successor Agency, or the Housing Authority, and are only special obligations of the Financing Authority to be paid from revenues and other funds pledged therefor. This arrangement comports with *Rider.*

SDOG asks us to ignore the separate legal status of the entities, but we may not do so. (*City of Cerritos v. Cerritos Taxpayers Assn.* (2010) 183 Cal.App.4th 1417, 1442, citing *Rider, supra,* 18 Cal.4th at p. 1044.) Other than attempting to distinguish *Rider,* SDOG cites no authority to support its position.[10]

3

Additionally, SDOG contends *Rider* is distinguishable on the ground that here, the City's financial reporting shows that the Financing Authority's debts are actually the

---

[10] The City asserts there was a good deal of "governance overlap" in *Rider* also, as the City's treasurer, controller, and attorney all served the financing authority there. The City, however, relies on lodged documents pertaining to the Convention Center expansion that were not before the trial court in this case. SDOG has filed an objection to the City's notice of lodgment, and a motion to strike portions of the City's brief pertaining to the lodged documents. We ignore the lodged documents, and deny the motion to strike as unnecessary. "We may consider only those facts which were before the trial court, and disregard any new factual allegations made for the first time on appeal." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.) "[I]t will be better to consider the appeal on all of the briefs submitted, rather than to spend time determining what, if any, portions of briefs are or are not relevant, or should or should not be stricken out. Irrelevant matters in briefs do not have any persuasive weight in determining an appeal." (*Estate of Green* (1955) 133 Cal.App.2d 451, 452.)

City's debts. SDOG relies on the stipulated facts that the Financing Authority follows generally accepted accounting principles (GAAP) promulgated by the Government Accounting Standards Board (GASB), and beginning in 2003, the Financing Authority's annual financial reporting has been incorporated in the City's annual financial report. SDOG emphasizes that the City's financial report for the fiscal year ending June 30, 2013, includes a note that states "[b]lended component units are those component units that, despite being legally separate entities, are so intertwined with the primary government that they are, in substance, the same as the primary government. These component units are reported as funds of the primary government." Under the accounting guidelines, the Financing Authority is deemed a "blended component unit" of the City. SDOG also asserts that because the Financial Authority's debts are included in the City's financial reports, the City's credit rating is at risk unlike the situation in *Rider*.

GASB is an advisory board located in Norwalk, Connecticut, which "sets standards of accounting and reporting for state and local governments." (*In re City of Stockton, California* (E.D.Cal. 2015) 526 B.R. 35, 47.) According to *Stockton,* GASB "was established in 1984 by agreement of the Financial Accounting Foundation and [10] national associations of state and local government officials. GASB recommendations are advisory but have achieved credibility among auditors and bond raters that leads most state and local governments to comply with them . . . ." (*Id.* at p. 47, fn. 23.) We conclude that a public agency's adherence to GASB and GAAP guidelines does not

override California law or delineate the legal rights and responsibilities of this state's public agencies. SDOG cites no authority to support a contrary conclusion.[11]

4

SDOG also contends *Rider* is distinguishable because there, the property that was the subject of the lease, the Convention Center, was to be improved with the bond funds, whereas here, the several properties that are the subject of the facilities lease are not to be improved with the bond funds. Rather, the bond funds will be used for the construction of numerous other improvements. While a factual distinction exists, it is again unavailing.

SDOG claims this court's opinion in *City of San Diego* "recogniz[ed] the difference between leases that are to generate money to improve what is collateral for the lease and leases that are to generate money to improve things *other* than the collateral on the lease." In *City of San Diego,* the defendants (collectively, Rider) in a validation action challenged a plan to fund improvements to the San Diego Jack Murphy Stadium (now Qualcomm Stadium), and to construct an offsite practice facility and office space. SDOG quotes this language from *City of San Diego, supra,* 47 Cal.App.4th at page 1492: "Rider complains the facility lease is not supported by consideration because it obligates the city to pay rent for use of a stadium it already owns. To the contrary, the city is *paying rent for use of an improved stadium, not for use of the one it presently owns*." (Italics added.) SDOG presumes that the italicized language means consideration for a

---

11    Given our holding, we need not consider the City's assertion that SDOG misrepresents the facts on the GASB/GAAP issue.

lease is lacking when the leased property will not be improved with the bond funds. In *City of San Diego,* however, we were not required to consider that issue, and we held no such thing. " 'It is axiomatic that cases are not authority for propositions not considered.' " (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.)

Further, SDOG has not cited any legal authority on the issue of consideration or developed any particular argument on the issue. SDOG relies exclusively on the two sentences from *City of San Diego, supra,* 47 Cal.App.4th at page 1492, quoted above. "The absence of cogent legal argument or citation to authority allows this court to treat the contention[] as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) Each point in a brief must be supported by "argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).)

Additionally, SDOG ignores that in *City of San Diego,* part of the bond funds were for improvements to property *other* than the leased property. (*City of San Diego, supra,* 47 Cal.App.4th at p. 1478.) Rider argued that under *Starr v. City and County of San Francisco* (1977) 72 Cal.App.3d 164 (*Starr*), it was improper "to spend part of the bond proceeds on off-site improvements to build a training facility and offices for the San Diego Chargers." (*City of San Diego,* at p. 1492.) We rejected the argument, explaining: "In *Starr*, the court determined a municipal lease-back arrangement was valid because each rental payment would be supported by consideration furnished that year, i.e., occupancy and use of the project. [Citation.] A separate Department of Housing and Urban Development repayment contract, however, was held not to satisfy the *Offner-Dean* rule because it created a 'future charge against general funds,' which was not

27

supported by consideration in the year the obligation was incurred and which could not be included in the yearly budget. [Citation.] Contrary to Rider's contention, *nothing in the opinion suggests a restriction on how or for what purpose a public entity may use bond proceeds obtained in the financing arrangement*." (*Ibid.*, italics added.) SDOG cites no authority to the contrary.

5

Further, SDOG attempts to distinguish *Rider* on the issue of consequences for a default. SDOG asserts that since the City does not own the Convention Center, if it defaulted on the lease in *Rider* it would not incur economic harm. Here, in contrast, if the City defaulted on the facilities lease it could lose possession of properties it already owns, and rents the City collects on some of the properties could go to bondholders if they assumed the lease.

*Rider* does not discuss the lease's default terms other than to acknowledge the City's rent could not be accelerated on default. (*Rider, supra*, 18 Cal.4th at p. 1044.) In *City of San Diego*, the leased property *did* belong to the City, and this court rejected the theory that default provisions took "the facility lease beyond constitutionally acceptable limits." (*City of San Diego, supra*, 47 Cal.App.4th at p. 1485.) We explained that "the constitution by its terms requires only that current debt not exceed current revenue. The constitutional debt limitation is to prevent deficit financing, i.e., incurring debt in one year to be paid in future years, only find it has increased 'like a rolling snowball,' placing the public entity in a position where it might not be able to meet financial obligations in the future." (*Ibid.*)

28

In the event of default in *City of San Diego,* the financing authority or its assignee could elect to terminate the lease, or affirm the lease and "(1) continue to collect rent from the [C]ity without taking possession or (2) take possession, relet the stadium and collect the rent deficiency from the [C]ity." (*City of San Diego, supra*, 47 Cal.App.4th at pp. 1479-1480 & fn. 5.) Bond investors were advised that if the City defaulted, "there is no right to accelerate base rental payments." (*Id.* at p. 1480.) The opinion notes that "if the [C]ity defaults on the rent, the lease creates no immediate indebtedness for aggregate payments due because the [Financing Authority] has waived its Civil Code section 1951.2 rights to future rent on an accelerated basis [citation]." (*Id.* at p. 1484.)

Rider argued the reletting provision violated *Offner-Dean* because the City would obtain no benefit when not in possession of the property. (*City of San Diego, supra,* 47 Cal.App.4th at p. 1486.) We disagreed, explaining that "[w]here reletting permits the initial tenant to continue to receive consideration, i.e., some present economic value from the lease, the constitution is not offended, even if the tenant is precluded from possession and still must take some form of payment." (*Id.* at p. 1487, citing *County of Los Angeles v. Nesvig* (1965) 231 Cal.App.2d 603, 612.) We noted that if the City defaulted, its benefits would "continue in the form of a rent credit and the guarantee that the [C]ity's existing contractual obligations relating to the use of the stadium will be performed." (*City of San Diego,* at p. 1487.)

Here, the default provisions of the facilities lease are substantively the same as in *City of San Diego*. On a default by the City, the trustee, as assignee of the Financing Authority's rights, may elect to terminate the lease, or affirm the lease and continue to

29

collect rent from the City without taking possession, or take possession, relet the properties (other than ground lease sites) and collect any rent deficiency from the City. Further, the facilities lease provides: "[I]n no event shall the [t]rustee have the right to accelerate the payment of any [rent] hereunder and, without limiting the generality of the foregoing, the [t]rustee specifically waives its rights under Section 1951.2 of the . . . Civil Code to accelerate payment of [rent] in the event of default by the City."

It is the appellant's burden to affirmatively demonstrate reversible error. (*California Pines Property Owners Assn. v. Pedotti* (2012) 206 Cal.App.4th 384, 393.) SDOG does not explain how the default provisions here cause the facilities lease to exceed constitutionally acceptable limits, and thus it does not meet its burden. SDOG predicts potential economic consequences to the City that do not pertain to the issue under review, whether the financial plan violates the debt limitation provisions. SDOG makes no showing that the City has taken on *noncontingent* debt.

None of SDOG's attempts to distinguish *Rider* is well taken. The City presumably uses the Financing Authority to avoid the two-thirds vote requirement, but doing so is legal. (*Rider, supra,* 18 Cal.4th at p. 1055.)

III

*Public Necessity*

SDOG also makes several claims of error unrelated to *Rider*. SDOG contends section 90(a) requires that as a threshold issue, voters must decide whether each of the projects to be funded by the 2014A Bond Series is a matter of public necessity.

Section 90(a) provides:

30

"Whenever the Council . . . determines that the public interest or necessity demands the acquisition, construction or completion of any municipal improvement authorized to be acquired, constructed, completed or maintained by [t]he [City], . . . the cost of which will be too great to be paid out of the ordinary annual income and revenue of said City, the Council may contract bonded indebtedness for said purposes or any of them, pledging the credit of the City or the property or revenue of any public utility owned by the City and the proceedings taken for incurring such indebtedness shall be in accordance with the mode and manner prescribed by the provisions of the general laws of the State of California relative to incurring bonded indebtedness by municipalities in force at the time such proceedings are taken.  Every ordinance or resolution determining that the public interest or necessity demands *such improvement* shall be adopted only by a vote of five members of the Council and it shall require a vote of two-thirds of the electors voting on each proposition at a regular or special election for the issuance of such bonds before *said indebtedness* or liability for said improvements may be incurred . . . ."  (Italics added.)

SDOG concedes that the first sentence of section 90(a) applies only to the bonded indebtedness of the City, and not to that of the Financing Authority.  SDOG submits, however, that the second sentence of section 90(a) "imposes a separate requirement for the adoption of *every* ordinance or resolution determining that the public interest or necessity demands a municipal improvement authorized to be acquired, constructed, completed or maintained by the City."

In other words, SDOG asks us to view the second sentence in isolation.  Under settled rules of statutory interpretation, however, "the various sections of a charter must be construed together, giving effect and meaning so far as possible to all parts thereof, with the primary purpose of harmonizing them and effectuating the legislative intent as therein expressed."  (*Creighton v. City of Santa Monica* (1984) 160 Cal.App.3d 1011, 1017.)  The terms "such improvement" and "said indebtedness" in the second sentence of

31

section 90(a) obviously refer, respectively, to the terms "any municipal improvement" and "bonded indebtedness" in the first sentence.  When read as a whole, section 90(a) does not apply to the Financing Authority.  Additionally, SDOG's interpretation would lead to absurd results, as the City could not make even emergency improvements covered by annual income and revenue without calling for a vote.

IV

*Validity of Third JPA*

A

Additionally, SDOG contends the Third JPA is "void" because under the law dissolving redevelopment agencies the Successor Agency "had no right to enter into a *new* agreement or *amend* an existing one," and the Housing Authority "did not have the legal ability to enter into *this* agreement."  Again, we disagree with SDOG.

"Since 1949, the Joint Exercise of Powers Act [Gov. Code, § 6500 et seq.] has permitted two or more municipalities to form a joint powers authority which they agree will exercise any power that each municipality has power to exercise individually."  (*City of La Mesa v. California Joint Powers Ins. Authority* (2005) 131 Cal.App.4th 66, 68.)  The Joint Exercise of Powers Act allows "governmental agencies [to] join together to accomplish goals that they could not accomplish alone, or that they might more efficiently and more effectively accomplish together."  (*Robings v. Santa Monica Mountains Conservancy* (2010) 188 Cal.App.4th 952, 962.)  " '[T]wo or more public agencies by agreement may jointly exercise any power common to the contracting parties,' and they may join in the creation of a separate entity to exercise those powers on

32

their behalf." (*Ibid.*; Gov. Code, § 6502.) "A joint powers authority can issue tax-exempt revenue bonds to finance construction projects that provide a public benefit and are located within the geographical boundaries of its member public agencies." (*California Statewide Communities Development Authority v. All Persons Interested, etc.* (2007) 40 Cal.4th 788, 794 (*California Statewide*); Gov. Code, § 6588, subd. (c).)

A housing authority is expressly authorized to enter into joint powers agreements. (Health & Saf. Code, §§ 34249, 34324.)  SDOG conceded the point at trial.  SDOG contends the Housing Authority was not authorized to enter into the Third JPA because it is intended for "non-housing purposes."

The projects to be funded by the 2014A Bond Series are City infrastructure projects, but the Third JPA's stated purpose is to provide a financing mechanism for each of the three public agency members.  The Third JPA provides:  "SECTION 1.  <u>PURPOSE</u> [¶]  This Agreement is made pursuant to the provisions of the [Joint Exercise of Powers] Act, relating to the joint exercise of powers common to public agencies for the purpose of assisting the financing of certain public capital facilities improvements of the City, the Successor Agency or the Housing Authority . . . ."  As the City observes, "the Housing Authority will be able to use the vehicle of the [Financing Authority] to assist the financing of capital improvements necessary for the development of affordable housing such as the installation of streets, sidewalks and storm water systems."

The Third JPA acknowledges that the City, the Successor Agency, and the Housing Authority have the common power to finance improvements for the public good,

33

a point SDOG does not dispute.[12]  The Third JPA also states the Mark-Roos Act "authorizes and empowers the [Financing] Authority to purchase Bonds . . . issued by the City, the Successor Agency, or the Housing Authority for financing public capital improvements, working capital, liability and other insurance needs, or projects whenever there are significant public benefits, as determined by the City, Successor Agency, or the Housing Authority."

At trial, SDOG cited Health and Safety Code section 34240, which states a housing authority "shall not transact any business or exercise its powers unless[,] by resolution[,] the governing body of the county or city declares that there is a need for an authority to function in it."  SDOG also cited Health and Safety Code section 34242, which provides that a housing authority "may adopt a resolution declaring that there is a need for a housing authority if it finds either of the following:  [¶]  (a)  That insanitary or unsafe inhabited dwelling accommodations in such county or city.  [¶]  (b)  That there is a shortage of safe or sanitary dwelling accommodations in such county or city available to persons of low income at rentals they can afford."  Neither statute, however, suggests a housing authority may not enter into a joint powers agreement for the purpose of financing potential projects.  Further, Health and Safety Code section 34249 cautions that

---

12     The Third JPA states the "City is authorized to issue bonds, expend bond proceeds, and borrow and loan money for certain public purposes pursuant to the Government Code . . . and the City Charter; the "Successor Agency is authorized to issue refunding bonds for certain public purposes pursuant to the Health and Safety Code," and; "the Housing Authority is authorized to issue bonds, expend bond proceeds, borrow and loan money, execute contracts, and purchase, hold, sell, lease, exchange or transfer any real or personal property for any of its purposes pursuant to the provisions of the Housing Authorities Law."

34

"[n]othing in this article shall be interpreted to prohibit" joint powers agreements under Government Code section 6500 et seq.

SDOG cites no authority precluding a housing authority from entering into a joint powers agreement whenever there is a potential that bond funds may be used to finance non-housing projects of another member agency. Under SDOG's theory, a housing authority could only enter into a joint powers agreement with another housing authority. Government Code section 6502, however, broadly provides: "If authorized by their legislative or other governing bodies, two or more public agencies by agreement may jointly exercise *any power common* to the contracting parties, . . . even though one or more of the contracting agencies may be located outside this state." (Italics added.) We agree with the trial court's finding here that "California law does not restrict the authority of the Housing Authority to participate in the Financing Authority."[13]

B

SDOG asserts the Successor Agency was unauthorized to enter into the Third JPA because the Legislature created successor agencies to wind down a redevelopment agency's activities rather than conduct any new business. SDOG cites Health and Safety Code section 34163, subdivision (b), which provides that as of June 29, 2011, a

---

[13] *California Statewide, supra,* 40 Cal.4th 788, demonstrates the breadth of joint powers authorities, specifically in the realm of bond financing. In *California Statewide,* "some 350 California cities, counties, and special districts . . . entered into agreements to create a joint powers authority, known as the California Statewide Communities Development Authority (the Authority) . . . . By issuing tax-exempt revenue bonds to finance industrial projects and residential units, as well as health care and educational facilities, the Authority promotes economic development for the benefit of its members." (*Id.* at p. 794.)

redevelopment agency is not authorized to "[e]nter into contracts with, incur obligations, or make commitments to, any entity . . . for any purpose," and subdivision (c), which provides that as of the same date a redevelopment agency is not authorized to "[a]mend or modify existing agreements."

Health and Safety Code section 34163 appears in division 24, part 1.8 of the Health and Safety Code (commencing with section 34161), titled Restrictions on Redevelopment Agency Operations. SDOG asserts that part 1.8 expressly prohibits successor agencies from entering into any contracts. Part 1.8's title, however, shows it applies to redevelopment agencies. Part 1.8 "is the 'freeze' component" of Assembly Bill 26. (*Matosantos, supra,* 53 Cal.4th at p. 250.) Part 1.8 "subjects redevelopment agencies to restrictions." (*Ibid.*)

Division 24, part 1.85 of the Health and Safety Code (commencing with section 34170), titled Dissolution of Redevelopment Agencies and Designation of Successor Agencies, applies here. "Part 1.85 (§§ 34170 to 34191) is the dissolution component. It dissolves all redevelopment agencies [citation] and transfers control of redevelopment agency assets to successor agencies, which are contemplated to be the city or county that created the development agency [citations]." (*Matosantos, supra,* 53 Cal.4th at p. 251.)

Part 1.85 authorizes a successor agency to enter into contracts, including joint powers agreements. Section 34180, subdivision (h) of the Health and Safety Code requires that certain actions by a successor agency be approved by the oversight board, including a "request by the successor agency to enter or reenter into an agreement with the city . . . that formed the redevelopment agency that it is succeeding . . . ." Health and

36

Safety Code section 34178, subdivision (a) provides: "Commencing on the operative date of this part [June 29, 2011], agreements, contracts, or arrangements between the city . . . that created the redevelopment agency and the redevelopment agency are invalid and shall not be binding on the successor agency; provided, however, that *a successor entity wishing to enter or reenter into agreements with the city . . . that formed the redevelopment agency that it is succeeding may do so . . . upon obtaining the approval of its oversight board.*" (Italics added.) SDOG acknowledged at trial that this provision "authorizes on its face" a successor agency's power to contract with a city or one of its subdivisions, such as a housing authority.

More specifically, subdivision (b)(3) of Health and Safety Code section 34178 provides that notwithstanding subdivision (a) of the statute, certain "agreements are not invalid and may bind the successor agency," including a "joint exercise of powers agreement in which the redevelopment agency is a member of the joint powers authority." SDOG conceded this means that after the dissolution of a redevelopment agency, a joint powers authority of which it was a member "doesn't go away" and the successor agency may "step into the redevelopment agency's shoes." That is what occurred here. After the Redevelopment Agency was dissolved, the Successor Agency took its place in an amended joint powers agreement, the Third JPA.

Subdivision (b)(3) of Health and Safety Code section 34178 limits a successor agency's participation in a joint powers authority "by the constraints imposed on successor agencies by the act adding this part." One of those constraints is that a successor agency shall not "create new enforceable obligations or begin redevelopment

37

work, except in compliance with an enforceable obligation . . . that existed prior to June 28, 2011." (Health. & Saf. Code, § 34177.3, subd. (a).)

The City asserts that participation in the Third JPA is not redevelopment work, as defined by sections 33020 through 33020.1 of the Health and Safety Code, and SDOG cites no authority to the contrary. SDOG's reliance on Health and Safety Code section 34177 is misplaced, as it sets forth the mandatory duties of successor agencies. It does not purport to limit a successor agency's activities to the listed items, or to prohibit a successor agency from taking the place of its predecessor redevelopment agency in a joint powers authority, as expressly authorized in Health and Safety Code section 34178, subdivision (b)(3). We agree with the trial court's conclusion that "California law does not restrict the authority of the Successor Agency to participate" in the Third JPA, at least until its existence is terminated.

Our conclusion is bolstered by the Department of Finance's acquiescence in the Successor Agency's participation in the Third JPA in the place of the dissolved Redevelopment Agency. Health and Safety Code section 34179, subdivision (h) provides: "The Department of Finance may review an oversight board action taken pursuant to this part. Written notice and information about all actions taken by an oversight board shall be provided to the department by electronic means and in a manner of the department's choosing. An action shall become effective five business days after notice . . . is provided unless the department requests a review." It is undisputed that the

38

Department of Finance was provided with a copy of the Third JPA and opted not to review the matter.[14]

V

*Financing Authority's Power to Issue Bonds*

Lastly, SDOG contends that because the Successor Agency is precluded from conducting new *redevelopment* business, as long as it is a member of the Third JPA the Financing Authority may not conduct new business of any kind, such as issuing the 2014A Bond Series. In SDOG's view, a successor agency has no power in common with other member agencies since it cannot conduct new redevelopment business.

Health and Safety Code section 34178, subdivision (b)(3) provides that on dissolution of a redevelopment agency, any joint powers agreement it executed remains valid. By operation of the dissolution laws, the successor agency replaces the redevelopment agency, with the caveat that "the successor agency's rights, duties, and performance obligations under that joint exercise of powers agreement shall be limited by the constraints imposed on successor agencies by the act adding this part." (*Ibid.*) By its express terms, the statute affects only the rights of the successor agency member. It is apparent that the Legislature intended to provide for the seamless continuation of JPAs on the dissolution of member redevelopment agencies. Thus, we do not imply any intent to prohibit new business by other members or by a financing authority.

---

14 Even if the Successor Agency was not properly included in the Third JPA, a joint powers authority needs only two public agency members to conduct business, here the City and the Housing Authority. (Gov. Code, § 6502.)

DISPOSITION

The judgment is affirmed.  Defendants are entitled to costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


McDONALD, J.