Filed 4/19/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>PUBLIC FACILITIES FINANCING AUTHORITY OF THE CITY OF SAN DIEGO et al.,<br><br>  Defendants and Respondents. | D075157<br><br><br>(Super. Ct. No. 37-2017-00004058-CU-MC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed in part; reversed in part with directions.

Higgs Fletcher & Mack, John Morris, and Rachel E. Moffitt, for Plaintiff and Appellant.

Mara W. Elliot, City Attorney, George Schaefer, Assistant City Attorney, and Meghan Ashley Wharton, Deputy City Attorney, for Defendants and Respondents Public Facilities Financing Authority of the City of San Diego and the City of San Diego.

No appearance for Defendant and Respondent Plaza de Panama Committee.

In order to fund construction of an underground parking garage and other improvements in Balboa Park, the City of San Diego entered into a "lease revenue bond" transaction. For a nominal fee, the City would lease the land underlying the improvements to the Public Facilities Financing Authority of the City of San Diego (Financing Authority). The Financing Authority, in turn, would lease the land and improvements back to the City in exchange for annual payments. The Financing Authority would issue bonds to fund construction of the improvements, secured by the City's annual lease payments to the Financing Authority. In the event of default by the Financing Authority, any recourse by the bondholders would be limited to collection of the City's lease payments. This type of transaction was approved by the Supreme Court in *Rider v. City of San Diego* (1998) 18 Cal.4th 1035 (*Rider*) and by this court in *San Diegans for Open Government v. City of San Diego* (2015) 242 Cal.App.4th 416 (*SanDOG*).

After *Rider* and *SanDOG*, San Diego voters approved several amendments to the San Diego City Charter regarding bond issuance. Plaintiff San Diegans for Open Government (SanDOG) challenged the Balboa Park lease revenue bond transaction based on these amendments. In SanDOG's view, one newly-amended provision restricts the ability of the City to use the Financing Authority to issue bonds without voter approval. The trial court disagreed, and we affirm the court's judgment on this issue. The provision in question reflects a limitation on City-issued bonds; it does not cover bonds issued by the Financing Authority. Moreover, even if the provision were not limited to City-issued bonds, it would not cover the lease revenue bonds contemplated here. The additional challenge asserted by

2

SanDOG (regarding a cooperation agreement) is moot; accordingly, we reverse that portion of the judgment with directions to dismiss the challenge as moot.

FACTUAL AND PROCEDURAL BACKGROUND

Approximately a decade ago, the City began discussions with entrepreneur and philanthropist Irwin Jacobs about potential enhancements to Balboa Park, the City's premier public space. The discussions culminated in a proposed revitalization project, including an underground parking garage and related improvements. The project was to be supported by a combination of public and private funds. Litigation, including an appeal to this court, delayed the project for several years. (See *Save Our Heritage Organisation v. City of San Diego* (2015) 237 Cal.App.4th 163.)

The litigation was resolved in the City's favor. To move the project forward, the City entered into a Cooperation Agreement with a group formed by Jacobs, the Plaza de Panama Committee. Under the Cooperation Agreement, the City agreed to commit at least $45 million in funding. The Committee agreed to contribute at least $30 million.

To fulfill its funding commitment, the City entered into the challenged transaction. Its counterparty, the Financing Authority, is a joint powers agency organized under state law. (See Gov. Code, § 6500 et seq.) It was formed by (1) the City, (2) the City in its capacity as the successor agency to the Redevelopment Agency of the City of San Diego, and (3) the Housing Authority of the City of San Diego. Although it is governed by a commission composed of the members of the San Diego City Council, it is an entity separate from the City. Its debts and obligations are not debts and obligations of the City. Any bonds issued by the Financing Authority are

3

special obligations of the Authority, and they do not constitute a debt of the City or a pledge of faith and credit of the City.

As noted, the City agreed to lease the land underlying the proposed Balboa Park improvements to the Financing Authority for a nominal fee. The Financing Authority, in turn, agreed to lease the land and any improvements back to the City. The Financing Authority would issue bonds, the sale of which would fund construction. Consistent with the governing document of the Financing Authority, the bonds were obligations of the Financing Authority, not the City. The bonds would be secured by the City's lease payments to the Financing Authority. The City would use its general fund to make these lease payments. The City anticipated that the revenue from operating the parking garage, which would be deposited in the general fund, would cover the payments.

In December 2016, the City Council approved the form and content of the lease agreements and the proposed bond documentation. Its ordinance stated, "The City hereby authorizes and approves, and requests the [Financing] Authority to approve and authorize, the issuance and sale by the Authority of the Bonds in a total aggregate principal amount not to exceed $50,000,000 . . . ." The members of the City Council, sitting as the governing commission of the Financing Authority, approved the form and content of the documents on its behalf. The Financing Authority's resolution stated, "The Authority hereby approves and authorizes the issuance and sale of its Bonds in a principal amount not to exceed $50,000,000 . . . ."

After these approvals, SanDOG filed the underlying lawsuit. The lawsuit challenged the bond issuance as well as various aspects of the Cooperation Agreement. It contended that the bond approvals were inconsistent with the recently-amended San Diego City Charter. The trial

4

court held a multiday bench trial and rejected SanDOG's contentions. SanDOG appeals.

## DISCUSSION

## I

### *Standards of Review and Interpretation*

SanDOG contends the trial court misinterpreted the San Diego City Charter, specifically section 90.1, titled "Revenue Bonds." (San Diego Charter, art. VII, § 90.1.)[1] We review the trial court's interpretation de novo. (*United Association of Journeymen v. City & County of San Francisco* (1995) 32 Cal.App.4th 751, 759, fn. 6.)

"We begin with the cardinal principle that the charter represents the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law. [Citation.] In this regard, '[t]he charter operates not as a grant of power, but as an instrument of limitation and restriction on the exercise of power over all municipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation.' " (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170.)

"The principles of construction that apply to statutes also apply to the interpretation of charter provisions. [Citation.] 'In construing a provision adopted by the voters our task is to ascertain the intent of the voters.' [Citation.] 'We look first to the language of the charter, giving effect to its plain meaning. [Citation.] Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history.' [Citation.] ' "An

---

[1] Subsequent undesignated section references are to the San Diego City Charter.

interpretation that renders related provisions nugatory must be avoided . . . , [and] each sentence must be read . . . in the light of the [charter's overall] scheme . . . ." ' [Citation.] 'When statutory language is susceptible of more than one reasonable interpretation, courts should consider a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history including ballot pamphlets, public policy, contemporaneous administrative construction and the overall statutory scheme.' " (*Don't Cell Our Parks v. City of San Diego* (2018) 21 Cal.App.5th 338, 349 (*Don't Cell*).)

Although we must independently interpret the text of the charter, an agency's "interpretation of the meaning and legal effect of a [provision] is entitled to consideration and respect by the courts[.]" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7.) "Where the meaning and legal effect of a [provision] is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.] Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. To quote the statement of the Law Revision Commission in a recent report, 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Id*. at pp. 7-8.)

## II

### *Prior Judicial Approval of Financing Authority Bonds*

The Supreme Court in *Rider* and this court in *SanDOG* previously approved the type of financial transaction at issue here. (See *Rider*, *supra*,

18 Cal.4th at p. 1039; *SanDOG*, *supra*, 242 Cal.App.4th at p. 424.) The Supreme Court explained that a joint powers agency, like the Financing Authority, has the power under state law to issue bonds in its own name. (*Rider*, at p. 1053; see Gov. Code, § 6540 et seq.) It therefore need not comply with the limitations that would apply to City-issued bonds, such as voter approval: "[W]hen the Financing Authority issues bonds, it does so independently of any common powers delegated in the joint powers agreement, and therefore it is not subject to the limitations that would apply to the City, including the two-thirds vote requirements in the [California] Constitution and the City's charter." (*Rider*, at p. 1054.) "[T]he Financing Authority is a separate legal entity from the City [citation], and the Financing Authority's debts are not the City's debts [citation]." (*Id.* at p. 1055.)

In *SanDOG*, this court followed *Rider* even where, as here, the Financing Authority is under the control of the City. We explained, "*Rider* made clear that for purposes of the debt limitation provisions, when a financing authority created to issue bonds 'has a genuine separate existence from the City,' 'it does not matter whether or not the City "essentially controls" the [f]inancing [a]uthority.'" (*SanDOG*, *supra*, 242 Cal.App.4th at pp. 437-438, quoting *Rider*, *supra*, 18 Cal.4th at p. 1044.) "Under the Joint Exercise of Powers Act, the Financing Authority has a genuine separate existence from the City. [Citation.] The Successor Agency and the Housing Authority also have genuine separate existences from the City. [Citations.] In recognition of the separate status, the [Financing Authority's governing document] specifies that bonds are not a debt of the City, the Successor Agency, or the Housing Authority, and are only special obligations of the

7

Financing Authority to be paid from revenues and other funds pledged therefor. This arrangement comports with *Rider*." (*SanDOG*, at p. 438.)

Along with its approval, the Supreme Court noted, "We are not naive about the character of this transaction. If the City had issued bonds . . . , the two-thirds vote requirement would have applied. Here, the City and the Port District have created a financing mechanism that matches as closely as possible (in practical effect, if not in form) a City-financed project, but avoids the two-thirds vote requirement. Nevertheless, the law permits what the City and the Port District have done. Plaintiffs are correct that this conclusion allows local governments to burden taxpayers with potentially high costs that voters have not approved, but local governments impose similar burdens on taxpayers every time they enter into long-term leases involving property of substantial value. We have long held that the two-thirds vote requirement does not apply to these leases so long as the obligation to pay rent is contingent on continued use of the leased property." (*Rider*, *supra*, 18 Cal.4th at p. 1055; see *SanDOG*, *supra*, 242 Cal.App.4th at p. 435.)

### III

*The City Charter Amendments*

In 2016, the City Council proposed several amendments to the City Charter provisions governing bond issuance. In its ordinance submitting the amendments for voter approval, the Council stated, "the provisions of the Charter dealing with the authorization and issuance of bonds have not been amended to reflect changes in state law, and updates are designed to simplify and conform the City's processes with the California Constitution[.]" San Diego voters approved the amendments later the same year.

8

Prior to the amendments, the Charter contained three sections covering bond issuance. Former section 90 authorized the City Council to "contract bonded indebtedness" by "pledging the credit of the City or the property or revenue of any public utility owned by the City[.]" (Former § 90, subd. (a).) Former section 90.1 authorized the City Council to issue "revenue bonds" for the construction and improvement of waterworks in the City. (Former § 90.1, subds. 2, 4.) These bonds "shall not constitute an indebtedness of the City" but shall be payable only from revenues of the City Water Department. (Former § 90.1, subd. 2.) Former section 90.2 similarly authorized the City Council to issue "revenue bonds" for the acquisition and construction of sewer facilities. (Former § 90.2, subds. 1, 2.) These bonds likewise "shall not constitute an indebtedness of the city" but shall be payable only from a Sewer Revenue Fund. (Former § 90.2, subd. 1.)

The 2016 amendments rewrote sections 90 and 90.1, and replaced section 90.2. Section 90, titled "General Obligation Bonds," now provides, "The Council is authorized to provide for the issuance of general obligation bonds in accordance with the California Constitution. General obligation bonds may be issued and sold in accordance with state law and any other local procedure adopted by ordinance." Section 90.1, titled "Revenue Bonds," provides, "The Council may authorize the issuance of revenue bonds by a two-thirds vote of the Council provided the bonds are not secured by or payable from the general fund or any fund other than an enterprise fund and that the purpose of the bond issue is to provide for the construction, reconstruction or replacement of water facilities, wastewater facilities, or stormwater facilities. All revenue bonds may be issued and sold in accordance with state law or any procedure established by ordinance."

9

The parties dispute whether section 90.1 applies to lease revenue bonds issued by the Financing Authority.  SanDOG contends that section 90.1 applies to revenue bonds, including those issued by the Financing Authority, and lease revenue bonds are a type of revenue bond.  SanDOG argues that the Financing Authority's lease revenue bonds are impermissible because they violate section 90.1's two conditions, that the bonds not be "payable from the general fund" and that they be used "for the construction, reconstruction or replacement of water facilities, wastewater facilities, or stormwater facilities."  The City and the Financing Authority, by contrast, contend that section 90.1's limitations do not apply to the Financing Authority.  Even if they did, they argue that the "revenue bonds" described in the section do not encompass the "lease revenue bonds" at issue here.

To resolve this dispute, we look first to the language of section 90.1. (*Don't Cell*, *supra*, 21 Cal.App.5th at p. 349.)  The section itself is silent regarding the scope of its application.  It states that the City Council may "authorize the issuance of revenue bonds," but it does not specify the issuing entity.  (§ 90.1)  Given the Financing Authority's separate legal existence, it would be reasonable to conclude that this City Charter section does not apply to it.  However, given the role of members of the City Council in governing the Financing Authority, it is possible to read the section more broadly.  We therefore turn to extrinsic aids to resolve this potential ambiguity.

"If . . . the language is susceptible of more than one reasonable meaning, we may consider the ballot summaries and arguments to determine how the voters understood the ballot measure and what they intended in enacting it."  (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 315 (*Tobacco II*).)  The amendments here were placed before the voters as "Proposition B" in a municipal special election.  The ballot title for the proposition was "Charter

10

Amendments Regarding the Authorization and Issuance of General Obligation Bonds and Revenue Bonds by the City of San Diego."  The ballot summary stated, "This proposition would amend the San Diego Charter to revise the processes by which the City authorizes the issuance of General Obligation Bonds and Revenue Bonds to conform the processes more closely with the California Constitution."

The ballot materials included an impartial analysis by the San Diego City Attorney.  The analysis explained, "The City of San Diego may choose to issue bonds when the City does not have sufficient cash available in any one year to fund the cost of certain capital improvements such as libraries, fire stations and streets.  Bonds are a form of borrowing in which the City sells bonds to investors and promises to pay the investors back over time."

The analysis described "General Obligation Bonds," which are paid from ad valorem property taxes imposed to pay debt service on the bonds each fiscal year.  It noted that the California Constitution requires voter approval of general obligation bonds.  The analysis stated that the proposed amendments would eliminate additional local requirements for general obligation bonds, some of which conflicted with state law.

As to "Revenue Bonds," the analysis explained that they "are bonds that are payable from enterprise funds, such as those related to the City's Water and Wastewater utilities."  It went on, "The Charter contains extensive provisions setting forth requirements for the City's issuance of Revenue Bonds for the Water and Wastewater utilities.  These provisions require a vote of the public and have not been used by the City to issue bonds in decades."  The proposed amendments "would allow the City to authorize the issuance of Revenue Bonds with a two-thirds vote of the City Council. The General Fund could not be used to pay Revenue Bonds.  The Revenue

11

Bonds could only be used to fund water facilities, wastewater facilities or stormwater facilities. Revenue Bonds could be issued and sold in accordance with state law or local procedures adopted by City Council."

The ballot materials also included a fiscal impact statement. After summarizing the amendments, it stated, "There is no fiscal impact associated with these Charter amendments."

The ballot materials contained an argument in favor of the proposition that was submitted by the City Council president and a City Council member, as well as the presidents of the San Diego Regional Chamber of Commerce and the League of Women Voters of San Diego. The argument stated, "These recommended Charter changes regarding the City's issuance of bonds" will streamline the Charter, simplify the section regarding general obligation bonds, and "[a]uthorize the issuance of revenue bonds by a two-thirds vote of the Council." It explained, "Your 'yes' vote on Prop B will update the City's issuance of bonds to read in plain language, accurately reflect existing practices, move appropriate provisions to the Municipal Code, and repeal language that is outdated or superseded by state or federal law." The ballot materials stated that no argument against the proposition was received by the City Clerk.

It is evident from the ballot materials that the amended provisions were not intended to effect any significant change in the City's practices. The argument in favor of the proposition explicitly states that it was intended, in part, to "accurately reflect current practices." The fiscal impact was estimated to be zero.

The ballot materials focused on the City's issuance of bonds. The City Attorney's impartial analysis notes that "[t]he City of San Diego may choose to issue bonds when the City does not have sufficient cash available" and

"[b]onds are a form of borrowing in which the City sells bonds to investors and promises to pay the investors back over time." This description does not cover bonds issued by the Financing Authority, which are not City-issued bonds, are not sold by the City, and do not involve a promise by the City to pay back investors over time. The argument in favor of the proposition explicitly references "the City's issuance of bonds" and later highlights that a vote in favor "will update the City's issuance of bonds to read in plain language, accurately reflect current practices, move appropriate provisions to the Municipal Code, and repeal language that is outdated or superseded by state or federal law."

It is notable that the ballot materials do not mention the Financing Authority or lease revenue bonds. Their absence is evidence that the voters did not contemplate that the proposed amendments would impact bonds issued by the Financing Authority. (See *Tobacco II*, *supra*, 46 Cal.4th at p. 318.) Indeed, the ballot materials' discussion of section 90.1 relates only to bonds for water and related facilities, payable from enterprise funds set up for that purpose. There is no indication the voters intended that this section would prohibit the issuance of bonds by a separate entity whose financing practices and purposes are unrelated to any of the concepts covered by the section.

Indeed, the historical context is relevant. (See *Woo v. Superior Court* (2000) 83 Cal.App.4th 967, 976-977.) Section 90.1 is descended from prior Charter provisions covering water facilities and funding specific thereto. The ballot materials confirm that the section continues to address water facilities and the financing tool used by the City in that context. The ability of the City to use the Financing Authority to issue lease revenue bonds is a separate, more general financing tool that is well-established in San Diego

13

and elsewhere. (See *Rider*, *supra*, 18 Cal.4th at p. 1041 [noting "the widespread use of similar financing plans throughout the state"]; *SanDOG*, *supra*, 242 Cal.App.4th at p. 425.) Given the history of section 90.1, and the City's prominent and separate use of the Financing Authority, the limited scope of section 90.1 is apparent.

Based on the extrinsic evidence, as well as the language and context of section 90.1, we conclude that the more reasonable interpretation of the section is that it covers bonds issued by the City, not bonds issued by the Financing Authority. (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["[I]f a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed[.]"].) The language of section 90.1 appears in the City Charter and does not purport to regulate the activities of legally separate entities like the Financing Authority. The ballot materials repeatedly discuss the City's issuance of bonds and do not mention the Financing Authority. The anticipated fiscal impact of the amended provisions, including section 90.1, was zero. And section 90.1 fits squarely within the City's established practice of issuing bonds for water-related improvements payable from specific enterprise funds. It does not regulate Financing Authority-issued lease revenue bonds.

SanDOG argues that we need not resort to extrinsic evidence because the plain meaning of section 90.1 compels its application to "all" revenue bonds, including lease revenue bonds issued by the Financing Authority. We disagree. Section 90.1 is silent regarding the scope of its application. Given the separate legal status of the Financing Authority, it is at least ambiguous whether the provision applies to bonds issued by the Financing Authority. Indeed, in its briefing, SanDOG repeatedly states that the bond provisions of the City Charter, before and after amendment, apply to the issuance of all

14

bonds " 'in the name of the City' "—which necessarily excludes bonds issued by the Financing Authority. (See *Rider, supra*, 18 Cal.4th at p. 1043 ["[T]hough the City's charter places restrictions *on the City* when it incurs certain debt, nothing in that charter indicates that those restrictions apply to a *joint powers agency* that the City might create."]; *SanDOG, supra*, 242 Cal.App.4th at p. 443 ["When read as a whole, [former] section 90(a) does not apply to the Financing Authority."].)

We requested supplemental briefing to address more precisely whether section 90.1 is limited to bonds issued by the City, as opposed to the Financing Authority. SanDOG responded that section 90.1's use of the word "authorize" reflects an intent to encompass bonds issued by both the City and the Financing Authority. (See § 90.1 ["The City Council may authorize the issuance of revenue bonds by a two-thirds vote of the Council . . . ."].) While the term may introduce additional ambiguity, we disagree that it compels the conclusion that section 90.1 applies to bonds issued by the Financing Authority. The Financing Authority is a separate entity, governed by its own commission. The ballot materials make clear that section 90.1 does not apply to it. SanDOG argues that the ballot materials are unenlightening because, although they reference the City's "issuance" of bonds, that language is necessarily "subsume[d]" by the broader term "authorize" in section 90.1. We disagree. The language of section 90.1 is ambiguous. The ballot materials shed light on its meaning. For the reasons discussed above, the most reasonable interpretation of section 90.1 is that it does not apply to bonds

15

issued by the Financing Authority. This interpretation does not create a "loophole," as SanDOG contends. It gives effect to the intent of the voters.[2]

Finally, even if section 90.1 applied to bonds issued by the Financing Authority, it would not apply to the lease revenue bonds here. SanDOG correctly points out that, in the world of municipal finance, lease revenue bonds are generally a type of revenue bond. While the general meaning of "revenue bond" is relevant, it is not determinative. We must interpret the phrase as it is used in the City Charter, and not in a vacuum. The City Charter distinguishes between "revenue bonds" and "lease revenue bonds," such that the first does not necessarily encompass the second. Section 90.3 identifies a number of "financing mechanism[s]" including "cash, loans, revenue bonds, lease revenue bonds or certificates of participation." (§ 90.3, subd. (b)(4).) While not definitive, the separate enumeration of "revenue bonds" and "lease revenue bonds" indicates that they may refer to different

---

[2]    At oral argument, SanDOG emphasized that the ballot materials repeatedly reference "conform[ity] . . . with the California Constitution" as a purpose of the proposed amendments. For example, as noted, the ballot summary stated, "This proposition would amend the San Diego Charter to revise the processes by which the City authorizes the issuance of General Obligation Bonds and Revenue Bonds to conform the processes more closely with the California Constitution." SanDOG argued that these references to the California Constitution show that the voters intended to prohibit the issuance of Financing Authority lease revenue bonds without the voter approval prescribed by the Constitution for City-issued bonds. We disagree. First, SanDOG's argument ignores the other indications of voter intent discussed above. Second, as held by the Supreme Court in *Rider* and this court in *SanDOG*, the City's use of the Financing Authority to issue lease revenue bonds already conforms with the California Constitution. (*Rider*, *supra*, 18 Cal.4th at pp. 1050, 1054; *SanDOG*, *supra*, 242 Cal.App.4th at pp. 437-438.) It is therefore unpersuasive to interpret the ballot materials as impliedly prohibiting this practice, especially in the absence of any reference to the Financing Authority or its bonds.

16

instruments. Moreover, section 77.1, which establishes an "Infrastructure Fund," prohibits the use of certain revenues "to fund debt service on General Fund lease revenue bonds issued before the date of this section." (§ 77.1, subd. (f).) The phrase "General Fund lease revenue bonds" is somewhat of an oxymoron, given that the City's general fund is not pledged to repay lease revenue bonds. As relevant here, it shows that the meaning of these phrases in the City Charter is not self-evident.

Again, we conclude the meaning of section 90.1, and specifically the phrase "revenue bond," is ambiguous. Even assuming the extrinsic evidence can be read to apply to Financing Authority-issued bonds, it does not support SanDOG's position that "revenue bond" encompasses "lease revenue bond." As used in section 90.1, the phrase "revenue bond" refers to a specific type of bond supported by a City enterprise fund. This reflects the City's longstanding practice, which it sought to make explicit in the Charter. (See *City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1091.) It also reflects the ballot materials, which describe revenue bonds in specific terms and predict no fiscal impact as a result of the amendments.

SanDOG claims that the lease revenue bonds here are supported by an "enterprise fund," i.e., the revenues from the parking garage, and therefore fit within section 90.1. The record does not support SanDOG's claim. The revenues from the parking garage will be deposited in the City's general fund, not a segregated "enterprise fund." While the City will use its general fund to make lease payments to the Financing Authority, there is no actual relationship between the parking garage revenues and the lease payments. Moreover, unlike the enterprise funds discussed in section 90.1, the parking garage revenues are not pledged in support of the lease revenue bonds. The lease revenue bonds are issued by the Financing Authority, not the City, and

the Financing Authority pledges the City's lease payments as security for the bonds.

SanDOG argues that the purpose of section 90.1 was "to preclude the City from incurring additional debt backed by the general fund without voter approval" and therefore it must apply to lease revenue bonds. This argument is unpersuasive because lease revenue bonds are not debt incurred by the City, nor are they backed by the City's general fund. (See *Rider*, *supra*, 18 Cal.4th at pp. 1045, 1056.) SanDOG also refers to the Charter's goal of " 'limit[ing] City officials,' " which appeared in City planning materials three years before the election. Even setting aside the issue of whether we may properly consider these materials, this general language is insufficient to support a specific interpretation of the phrase "revenue bonds."

In sum, we conclude section 90.1 does not apply to lease revenue bonds issued by the Financing Authority. The plain language does not unambiguously encompass such bonds, and the ballot materials make clear that the voters intended section 90.1 to have a limited scope. The type of financial transaction at issue here, approved in *Rider* and *SanDOG*, is not prohibited by the 2016 amendments to the San Diego City Charter.

IV

*Cooperation Agreement*

As noted *ante*, in addition to challenging the bond approvals, SanDOG's lawsuit also challenged various aspects of the Cooperation Agreement between the City and the Plaza de Panama Committee. During this appeal, the Plaza de Panama Committee terminated the Cooperation Agreement. SanDOG's challenge to the Cooperation Agreement is therefore moot. Consequently, we grant SanDOG's unopposed motion to take evidence of the Cooperation Agreement's termination (see *In re K.M.* (2015) 242 Cal.App.4th

18

450, 456) and reverse the judgment in part with directions to dismiss as moot SanDOG's challenge to the Cooperation Agreement itself (see *Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2011) 198 Cal.App.4th 939, 944, 947).

## DISPOSITION

The judgment as to section 90.1 is affirmed.  The judgment as to the Cooperation Agreement is reversed with directions to dismiss SanDOG's challenge as moot.  The parties shall bear their own costs on appeal.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.

19